[S.F. No. 24435. Feb. 7, 1985.]

FRANK ROA, JR., et al., Plaintiffs and Appellants, v.
LODI MEDICAL GROUP, INC., et al., Defendants and Respondents.

922

**COUNSEL**

Miller, Katz, Harlem & Dixon, Robert A. Harlem, Richard L. Katz, Laurence H. Tribe and Arthur E. Schwimmer for Plaintiffs and Appellants.

David M. Harney, Michael F. Dillingham, Arne Werchick, Wylie A. Aitken, Richard D. Bridgman, Glen T. Bashore, Edwin Train Caldwell,

Robert E. Cartwright, Victoria J. De Goff, Sanford Gage, John Gardenal, Ian Herzog, G. Dana Hobart, Harvey R. Levine, Edward I. Pollock, Jerome B. Falk, Jr., Dirk M. Schenkkan and Howard, Prim, Rice, Nemerovski, Canady & Pollak as Amici Curiae on behalf of Plaintiffs and Appellants.

No appearance for Defendants and Respondents.

Musick, Peeler & Garrett, James E. Ludlam, Horvitz & Greines, Horvitz & Levy, Ellis J. Horvitz, S. Thomas Todd, Kent L. Richland, John L. Klein, Hassard, Bonnington, Rogers & Huber, David E. Willett, Maureen E. Corcoran and Fred J. Hiestand as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**KAUS, J.**—This is the third in a series of cases involving the constitutionality of various provisions of the Medical Injury Compensation Reform Act of 1975 (MICRA). In *American Bank & Trust Co.* v. *Community Hospital* (1984) 36 Cal.3d 359 [204 Cal.Rptr. 671, 683 P.2d 670], we upheld a provision of the act which authorizes the periodic payment of damages in medical malpractice actions. (Code Civ. Proc., § 667.7.) In *Barme* v. *Wood* (1984) 37 Cal.3d 174 [207 Cal.Rptr. 816, 689 P.2d 446], we concluded that a provision of the act barring a "collateral source" from obtaining reimbursement from a medical malpractice defendant was also constitutional. (Civ. Code, § 3333.1, subd. (b).) In this case we address a challenge to Business and Professions Code section 6146, which places limits on the amount of fees an attorney may obtain in a medical malpractice action when he represents a party on a contingency fee basis.[1] As in *American Bank* and *Barme,* while we express no view as to the wisdom of the measure, we conclude that the legislation is constitutional.

[1]Section 6146 provides in relevant part: "(a) An attorney shall not contract for or collect a contingency fee for representing any person seeking damages in connection with an action for injury or damage against a health care provider based upon such person's alleged professional negligence in excess of the following limits: [¶] (1) Forty percent of the first fifty thousand dollars ($50,000) recovered. [¶] (2) Thirty-three and one-third percent of the next fifty thousand dollars ($50,000) recovered. [¶] (3) Twenty-five percent of the next one hundred thousand dollars ($100,000) recovered. (4) Ten percent of any amount on which the recovery exceeds two hundred thousand dollars ($200,000). [¶] The limitations shall apply regardless of whether the recovery is by settlement, arbitration, or judgment, or whether the person for whom the recovery is made is a responsible adult, an infant, or a person of unsound mind. [¶] . . . [¶] (c) For purposes of this section: [¶] (1) 'Recovered' means the net sum recovered after deducting any disbursements or costs incurred in connection with prosecution or settlement of the claim. Costs of medical care incurred by the plaintiff and the attorney's office-overhead costs or charges are not deductible disbursements or costs for such purpose. . . ."

Unless otherwise stated, all section references are to the Business and Professions Code.

# I

This action was brought by Frank Roa, Jr., individually, and by Yvonne Jean Roa, individually and as guardian ad litem for their minor son, Frank Joseph Roa, for injuries allegedly suffered as a result of negligent treatment and care during the child's birth. The complaint named the Lodi Medical Group, Inc., Dr. Gordon B. Roget, the Lodi Community Hospital and numerous Does as defendants.

After some discovery, plaintiffs negotiated a settlement with two of the defendants, the Lodi Medical Group, Inc., and Dr. Roget. The agreement provided for payment of $495,000 to the minor and $5,000 to the parents. Pursuant to Probate Code section 3500,[2] plaintiffs sought court approval of the settlement, advising the court that the $500,000 represented the total policy limits of these two defendants' insurance coverage. The court found the settlement reasonable and approved it.

At the same time, pursuant to Probate Code section 3601,[3] plaintiffs requested that the court approve the payment of fees to their attorneys from the net proceeds of the settlement. Plaintiffs informed the court that they were aware that the maximum fee that could be awarded under the schedule of contingency fees set forth in section 6146 would amount to about $90,800. They explained, however, that they believed that under their contingency fee arrangement, the attorneys were entitled to 25 percent of the minor's net recovery—about $122,800—and asked the court to award their counsel this greater amount. Accompanying this request, plaintiffs' attorneys filed points and authorities asserting that section 6146 was unconstitutional on due process, equal protection and separation of powers grounds.

The trial court found (1) that plaintiffs and their attorneys had entered into an understanding that the attorney fee would be 25 percent of the net recovery and (2) that the $122,800 fee which that percentage would yield "is a fair and reasonable amount for attorneys' fees in this case and is in no way disproportionate to the quality or quantity of the legal services provided to the plaintiffs in this case." The court also noted that "were it not

---

[2] Section 3500 provides in relevant part: "(a) When a minor has a disputed claim for damages . . . and does not have a guardian of the estate, the following persons have the right to compromise . . . the claim . . .: [¶] (1) Either parent if the parents of the minor are not living separate and apart. . . . [¶] (b) The compromise or covenant is valid only after it has been approved, upon the filing of a petition, by the superior court . . . ."

[3] Section 3601 provides in relevant part: "(a) The court making the order or giving the judgment [approving the compromise of a minor's disputed claim], as a part thereof, shall make a further order authorizing and directing that such reasonable expenses . . . costs, and attorney's fees, as the court shall approve and allow therein, shall be paid from the money or other property to be paid or delivered for the benefit of the minor or incompetent person."

for the existence of Business and Professions Code [section] 6146, the amount of attorneys' fees requested" by plaintiffs would be awarded. The court, however, rejected the constitutional challenge to section 6146 and concluded that it was compelled to award fees in accordance with the statutory limitations. Accordingly, it approved a fee of $90,800.

Plaintiffs appeal from the attorney fee order, reasserting their constitutional objections to section 6146.[4]

## II

Plaintiffs, and amici on their behalf, contend that section 6146 is unconstitutional as (1) a denial of due process, (2) a violation of equal protection, and (3) a violation of the separation of powers doctrine. We address each of the contentions in turn.

## A

■ Plaintiffs' due process argument rests on the claim that the statute impermissibly infringes on the right of medical malpractice victims to retain counsel in malpractice actions. ■ Although the right to be represented by retained counsel in civil actions is not expressly enumerated in the federal or state Constitution, our cases have long recognized that the constitutional due process guarantee does embrace such a right. (See, e.g., *Powell*

---

[4]One amicus questions whether plaintiffs may properly maintain this appeal. Because the trial court order has the effect of preserving more of the settlement for the minor's own use than the fee requested by plaintiffs, amicus suggests that plaintiffs are not "aggrieved" by the trial court order and may not prosecute this appeal on their own behalf. (See Code Civ. Proc., § 902.) Amicus asserts that if plaintiffs' attorneys were dissatisfied, they should have challenged the order themselves.

Although the attorneys may well have had standing to appeal from the order in question (cf., e.g., *Estate of Merrill* (1946) 29 Cal.2d 520, 523 [175 P.2d 819]), it does not necessarily follow that plaintiffs are not themselves entitled to prosecute this appeal. (See *Estate of Lagersen* (1962) 210 Cal.App.2d 788, 791-792 [26 Cal.Rptr. 783].) While many in plaintiffs' position might not consider themselves aggrieved by the trial court ruling, one of plaintiffs' contentions on appeal is that the fee limitations of section 6146 are invalid because they impinge on the right of malpractice plaintiffs to retain competent counsel. Plaintiffs argue that if the statutory limits remain in place, their attorneys will have less of an incentive to pursue additional recovery against the remaining defendants who are not covered by the settlement. We conclude that plaintiffs should not be deprived of the opportunity to pursue this substantive argument on appeal by a threshold determination that they are not "aggrieved" as a matter of law.

We have no occasion to decide at this juncture whether, as a matter of professional ethics, the potential conflict of interest between plaintiffs and their attorneys on the attorney fee issue called for separate representation of their interests. We hold only that the appeal may properly be maintained by plaintiffs. We note that numerous amicus briefs have been filed on both sides of the constitutional issue, assuring that the competing viewpoints are adequately represented.

v. *Alabama* (1932) 287 U.S. 45, 68-69 [77 L.Ed. 158, 170-171, 53 S.Ct. 55, 84 A.L.R. 527]; *Mendoza* v. *Small Claims Court* (1958) 49 Cal.2d 668, 673 [321 P.2d 9].) ▮ Section 6146, however, does not in any way abrogate the right to retain counsel, but simply limits the compensation that an attorney may obtain when he represents an injured party under a contingency fee arrangement.

Statutory limits on attorney fees are not at all uncommon, either in California or throughout the country generally. In this state, attorney fees have long been legislatively regulated both in workers' compensation proceedings (Lab. Code, § 4906) and in probate matters. (Prob. Code, §§ 910, 901.) Some states have adopted maximum fee schedules which apply to *all* personal-injury contingency fee arrangements (see, e.g., *American Trial Lawyers* v. *New Jersey Supreme Ct.* (1974) 66 N.J. 258 [330 A.2d 350]; *Gair* v. *Peck* (1959) 6 N.Y.2d 97 [188 N.Y.S.2d 491, 160 N.E.2d 43, 77 A.L.R.2d 390], app. dismissed (1960) 361 U.S. 374 [4 L.Ed.2d 380, 80 S.Ct. 401]); others have enacted limits which, like section 6146, apply only in a specific area, such as medical malpractice. (See, e.g., *Johnson* v. *St. Vincent Hospital, Inc.* (1980) 273 Ind. 374 [404 N.E.2d 585, 602-603]; *Prendergast* v. *Nelson* (1977) 199 Neb. 97 [256 N.W.2d 657, 669-670]; *DiFilippo* v. *Beck* (D.Del. 1981) 520 F.Supp. 1009, 1016.) Congress has passed numerous statutes limiting the fees that an attorney may obtain in representing claimants in a variety of settings. (See, e.g., 28 U.S.C. § 2678 [limit on attorney fee in actions under the Federal Tort Claims Act]; 42 U.S.C. § 406(b)(1) [limit on attorney fee in actions under the Social Security Act]; 38 U.S.C. § 3404 [limit on fee for claims under the Veterans Benefit Act].)

The validity of such legislative regulation of attorney fees is well established. Over 60 years ago, in *Calhoun* v. *Massie* (1920) 253 U.S. 170 [64 L.Ed. 843, 40 S.Ct. 474], an attorney who had represented successful claimants in an action against the United States raised a similar due process challenge to a provision of federal law which limited contingent fee recoveries to 20 percent of the amount recovered. In rejecting the challenge, Justice Brandeis explained: "For nearly three-quarters of a century Congress has undertaken to control in some measure the conditions under which claims against the Government may be prosecuted. Its purpose has been in part to protect just claimants from extortion or improvident bargains and in part to protect the Treasury from frauds and imposition. [Citation.] While recognizing the common need for the service of agents and attorneys in the presentation of such claims and that parties would often be denied the opportunity of securing such services if contingent fees were prohibited [citation], Congress has manifested its belief that the causes which gave rise to laws against champerty and maintenance are persistent. By the enactment,

from time to time, of laws prohibiting the assignment of claims and placing limitations upon the fees properly chargeable for services, Congress has sought both to prevent the stirring up of unjust claims against the Government and to reduce the temptation to adopt improper methods of prosecution which contracts for large fees contingent upon success have sometimes been supposed to encourage. *The constitutionality of such legislation . . . resembling in its nature the exercise of the police power, has long been settled.* [Citations.]" (Italics added, fn. omitted.) (253 U.S. at pp. 173-174 [64 L.Ed. at pp. 845-846]; see, e.g., *Frisbie* v. *United States* (1895) 157 U.S. 160, 165-166 [39 L.Ed. 657, 658-659, 15 S.Ct. 586]; *Yeiser* v. *Dysart* (1925) 267 U.S. 540, 541 [69 L.Ed. 775, 779, 45 S.Ct. 399]; *Margolin* v. *United States* (1925) 269 U.S. 93, 102 [70 L.Ed. 176, 180, 46 S.Ct. 64]; *Estate of Goodrich* (1907) 6 Cal.App. 730, 732 [93 P. 121].) These decisions establish that—contrary to amici's contentions—legislative ceilings on attorney fees are in no respect "constitutionally suspect" or subject to "strict" judicial scrutiny.[5]

---

[5] One amicus—in an argument embraced by the dissent—attempts to invoke "strict judicial scrutiny" on a different tack. Noting that the right to maintain a lawsuit has been viewed as one aspect of the First Amendment right to petition the government for redress of grievances (see, e.g., *Mine Workers* v. *Illinois Bar Assn.* (1967) 389 U.S. 217, 222-223 [19 L.Ed.2d 426, 430-431, 88 S.Ct. 353]), and that in *Buckley* v. *Valeo* (1976) 424 U.S. 1, 51-54 [46 L.Ed.2d 659, 706-707, 96 S.Ct. 612], the Supreme Court, inter alia, invalidated, on First Amendment grounds, statutory limits on the amount of his own funds a candidate could spend in seeking public office, amicus argues that "the decision of how much should be spent, and is necessary to spend, [on attorney fees] is one which [plaintiffs] desiring to exercise their First Amendment rights of petition and speech are constitutionally entitled to make for themselves." Although the argument is creative, its logic clearly proves too much, for it would preclude a state from imposing *any* limitation on attorney fees, no matter how unconscionably high such fees might be, a position even amicus does not embrace.

The use of contingency fees in connection with the pursuit of First Amendment activities has historically been the subject of governmental regulation and restriction. Indeed, California—like a great number of states—has long *completely prohibited* lobbyists, including attorney-lobbyists, from using contingency fee agreements in connection with the most "hardcore" of First Amendment activities. (See Gov. Code, § 86205, subd. (f) ["No lobbyist shall . . . (f) Accept or agree to accept any payment in any way contingent on the defeat, enactment or outcome of any proposed legislative or administrative action."]. See generally Maggio, *Lobbying—Multistate Statutory Survey* (1962) 38 Notre Dame Law. 79, 85-86.) We are unaware of any decision which questions the validity of such legislation.

Of course, unlike the lobbyist provision, section 6146 does not prohibit the use of contingency fees in medical malpractice actions, but simply places limits on the percentage of a plaintiff's recovery that an attorney may retain when he represents the plaintiff on a contingency basis. To the extent that amicus'—and the dissent's—First Amendment contention rests on the proposition that the particular fees allowed by section 6146 are too low to permit the effective exercise of the right to bring a lawsuit, the argument parallels plaintiff's claim—discussed below—that the statute denies his due process right to counsel by making it difficult or impossible to secure an attorney. As we explain, the record provides no factual basis to support such a claim.

Furthermore, for the same reason there is no merit to the claim that the statute on its face unconstitutionally discriminates against poor plaintiffs. Although it may be that the continued availability of contingency fee contracts is more important to poor than to rich litigants, without a factual showing that the fee limits at issue here are so low as to impinge on a

Plaintiffs contend, however, that even if statutory limitations on attorney fees are generally permissible, the limits established by section 6146 are invalid because the authorized fees are so low that in practice the statute will make it impossible for injured persons to retain an attorney to represent them. The adequacy of the fees permitted by the statute is in large measure an empirical matter, and plaintiffs have made no showing to support their factual claim. Furthermore, a comparison of the fees permitted by section 6146 with the fees authorized under the numerous statutory schemes noted above suggests that section 6146's limits are not unusually low.[6] Under the circumstances, we certainly cannot hold that the amount of the fees permitted renders the statute unconstitutional on its face.

Plaintiffs alternatively challenge the "sliding scale" nature of the fee schedule, asserting that the decreasing percentage permitted for larger recoveries creates a conflict of interest between attorney and client, reducing

---

plaintiff's ability to obtain a lawyer, there is no basis for finding that the statute works an invidious discrimination against the poor. It can as logically be argued that the statute—by limiting the fees an attorney can charge when he represents a client on a contingency basis—operates to the benefit of poor plaintiffs.

[6]As noted, section 6146 authorizes a contingency fee of up to (1) 40 percent of the first $50,000 recovered, (2) 33⅓ percent of the next $50,000, (3) 25 percent of the next $100,000, and (4) 10 percent of any amount exceeding $200,000.

Under the New Jersey schedule upheld in *American Trial Lawyers* v. *New Jersey Supreme Ct., supra,* 330 A.2d 350, which provided something of a model for section 6146, the maximum permissible fees were: (1) 50 percent of the first $1,000, (2) 40 percent of the next $2,000, (3) 33⅓ percent of the next $47,000, (4) 20 percent of the next $50,000, and (5) 10 percent of any amount over $100,000. (See 330 A.2d at p. 351, fn. 3.) The New Jersey rule also permitted an attorney to request additional fees in exceptional situations. Under that schedule, the fee for the settlement in this case would have been limited to approximately $66,400, rather than the $90,800 permitted by section 6146. Although the New Jersey schedule, as modified in 1984 (see N. J. Rule 1:21-7 (as amended Jan. 1984)), does authorize somewhat greater fees than section 6146 in a variety of instances, the disparity does not in itself demonstrate that section 6146's fee limits deny access to an attorney.

The federal statutes generally designate a single, maximum percentage fee, applicable without regard to the amount of the recovery. The Federal Tort Claims Act limits fees to 25 percent of a judgment or settlement obtained after a court action has been filed, and 20 percent of any recovery obtained prior to such filing. (28 U.S.C. § 2678.) The Social Security Act authorizes reasonable fees not in excess of 25 percent of the claimant's recovery. (42 U.S.C. § 406(b)(1).) The Veterans Benefit Act contains perhaps the most restrictive provision, limiting the fee that may be obtained by anyone assisting a claimant to a mere $10. (38 U.S.C. § 3404.) Although this provision has been upheld against constitutional challenge in numerous decisions (e.g., *Frisbie* v. *United States* (1895) 157 U.S. 160, 165-166 [39 L.Ed. 657, 658-659, 15 S.Ct. 586]), one federal district court recently enjoined its application, concluding that the practical effect of this low limit raised substantial doubts as to the statute's continuing constitutional viability. (*National Assn. of Radiation Survivors* v. *Walters* (N.D.Cal. 1984) 589 F.Supp. 1302.) The United States Supreme Court has noted probable jurisdiction in the *Walters* case (*Walters* v. *National Assoc. of Rad. Survivors* (1984) — U.S. — [83 L.Ed.2d 698, 105 S.Ct. 588]) and has stayed the district court's injunction pending review of the decision. (— U.S. — [82 L.Ed.2d 908, 105 S.Ct. 11] [stay granted by Rehnquist, J.]; — U.S. — [83 L.Ed.2d 178, 105 S.Ct. 238] [request to vacate stay denied by court].)

the attorney's incentive to pursue a higher award. As a number of commentators have explained, however, potential conflicts of interest are inherent in all contingent fee arrangements. (See generally MacKinnon, Contingent Fees for Legal Services (1964) pp. 196-200; Schwartz & Mitchell, *An Economic Analysis of the Contingent Fee in Personal-Injury Litigation* (1970) 22 Stan.L.Rev. 1125, 1136-1139.) On the one hand, whenever a contingency fee agreement provides for either a flat percentage rate regardless of the amount of recovery or a declining percentage with an increase in recovery, "it may be to the lawyer's advantage to settle [the case] quickly, spending as little time as possible on the small claim where the increment in value through rigorous bargaining or trial, while significant to the client, is not significant or perhaps compensatory to the lawyer. . . ." (MacKinnon, *supra*, at p. 198.) On the other hand, "[w]here the rate is graduated according to the stage of litigation at which recovery is attained . . . the increase in the rate of fee may lead the lawyer to bring suit or start trial, for example, solely to increase his rate from 25% to 33⅓%, without actually doing that much additional work and without the likelihood of a comparable increment to the client." (*Ibid.*) Furthermore, no matter how the particular percentage fee is calculated, "[t]he difference in the financial position of the lawyer and client may make for a complete disparity in their willingness to take a risk on a large recovery as against no recovery at all. In the same way the use of delay to increase the eventual recovery on a claim may have an entirely different impact on the injured and uncompensated claimant than it does on the lawyer, who is busy with other claims and regards this as one of a series which are ripening on the vine. . . ." (*Id.* at p. 199.) Thus, though the sliding scale arrangement embodied in section 6146 may affect the settings in which the attorney's and client's interests diverge, it does not create the basic conflict of interest problem.

Indeed, section 6146's decreasing sliding-scale approach has been recommended as the preferable form of regulation by a number of studies that have examined the question. As a report of an American Bar Association commission explained: "[I]n order to relate the attorney's fee more to the amount of legal work and expense involved in handling a case and less to the fortuity of the plaintiff's economic status and degree of injury, a decreasing maximum schedule of attorney's fees, reasonably generous in the lower recovery ranges and thus unlikely to deny potential plaintiffs access to legal representation, should be set on a state-by-state basis." (Rep. of Com. on Medical Professional Liability (1977) 102 ABA Annual Rep. 786, 851. See also Dept. of HEW, Rep. of Sect's. Com. on Medical Malpractice (1973) pp. 34-35; Kohlman, *An Equitable Contingency Fee Contract* (1975) 50 State Bar J. 268, 295-298 & fn. 42.) For just these reasons, the Legislature could rationally have determined that this aspect of the statutory scheme would promote the fairness of attorney fees. The sliding scale

schedule certainly does not unconstitutionally impinge on a malpractice victim's right to counsel.

Finally, plaintiffs suggest that because the fee limits of section 6146 apply only to medical malpractice actions, the statute will operate to drive the most competent attorneys out of medical malpractice litigation into other areas of personal injury practice; they argue that this amounts to an unconstitutional infringement of a malpractice victim's right to counsel. Once again, plaintiffs have failed to make any showing to support the factual premise of their contention. In addition, a similar claim could, of course, be raised with respect to every statutory provision which creates legislative limits on attorney fees in a particular field. As we have seen, such statutes are commonplace. Suffice it to say that we know of no authority which suggests that due process requires a single, uniform attorney fee schedule for all areas of practice.

### B

We turn to the equal protection claim. Here plaintiffs' principal contention—somewhat related to their final due process argument—rests on the assertion that the Legislature acted arbitrarily in selectively imposing section 6146's attorney fee limits only in medical malpractice actions.

In *American Bank* and *Barme* we explained the background against which MICRA was adopted and there is no need to repeat that discussion here. In brief, the Legislature found that the high cost of medical malpractice insurance premiums was (1) threatening to curtail the availability of medical care in the state and (2) creating a situation in which patients, injured by medical malpractice, might well find that there was no liability insurance to cover the damages they had sustained. To meet those problems, the Legislature enacted a series of measures aimed at reducing medical malpractice insurance costs. In *American Bank* and *Barme* we found that it was entirely rational for the Legislature to limit the application of the enacted measures to the medical malpractice field, since it was the "crisis" in that particular area which the Legislature hoped to alleviate.

Plaintiffs contend that this reasoning does not apply to section 6146. They maintain that while the statutory measures at issue in *American Bank* and *Barme* were directly related to reducing the costs borne by medical malpractice defendants and their insurers, section 6146 has no such effect, for it simply limits the percentage of a malpractice *plaintiff*'s judgment that may be paid to the plaintiff's attorney. Plaintiffs insist that since a contingency fee is by definition paid from the plaintiff's recovery, and since a jury may not properly consider such fees in assessing damages (see *Krouse* v. *Gra-*

*ham* (1977) 19 Cal.3d 59, 79-82 [137 Cal.Rptr. 863, 562 P.2d 1022]), the statutory limitations on such fees will not reduce defense costs at all. They suggest that if the Legislature wanted to reduce such costs, it should have limited the fees malpractice defense attorneys may charge, rather than the contingency fees obtained by attorneys for malpractice plaintiffs.[7]

We cannot agree that the limits on contingency fees embodied in section 6146 bear no rational relationship to the objectives of MICRA. In the first place, it is unrealistic to suggest that such limits will not reduce the costs to malpractice defendants and their insurers in the large number of malpractice cases that are resolved through settlement. A plaintiff is quite naturally concerned with what a proposed settlement will yield to him personally, and because section 6146 permits an attorney to take only a smaller bite of a settlement, a plaintiff will be more likely to agree to a lower settlement since he will obtain the same net recovery from the lower settlement. Accordingly, the Legislature could reasonably have determined that the provision would serve to reduce malpractice insurance costs.[8]

Second, the Legislature may also have imposed limits on contingency fees in this area as a means of deterring attorneys from either instituting frivolous suits or encouraging their clients to hold out for unrealistically high settlements. Although plaintiffs contend that there is no evidence to suggest that unregulated contingency fee agreements pose special problems in the medical malpractice field, plaintiffs themselves stress—in another context—that an unusually high percentage of medical malpractice cases that go to trial result in defense verdicts. While there may be many explanations for this phenomenon, the Legislature could rationally have believed that unregulated contingency fee contracts—calling for potentially huge attorney fee awards if cases are won—play at least some part in leading so many plaintiffs to pursue malpractice claims that ultimately prove unsuccessful. (See, e.g., *DiFilippo* v. *Beck, supra,* 520 F.Supp. 1009, 1016.) Of course, even when defendants ultimately win such lawsuits, they and their insurers incur considerable expense in defending the action. Thus, by reducing plaintiffs'

---

[7] In enacting MICRA, the Legislature did adopt a provision directing the Board of Governors of the State Bar to "report and make recommendations to the Legislature by July 1, 1976, on an equitable method for regulating compensation of defense counsel consistent with the policies embodied in this article regarding regulation of plaintiff's attorney fees." (Former § 6146, subd. (c), enacted Stats. 1975, Second Ex. Sess., ch. 1, § 24.2, p. 3967.) After appointing a committee to study the problem, the State Bar recommended that the Legislature take no action with respect to defense fees, and the Legislature repealed former subdivision (c) in 1981. (Stats. 1981, ch. 714, § 23, p. 2580.)

[8] Plaintiffs cannot legitimately claim that the Legislature should have restricted the limits on contingency fees *only* to cases of settlement, for the Legislature could reasonably have feared that any such restriction would strongly discourage plaintiffs' attorneys from promoting settlements.

attorneys' incentive to encourage their clients to pursue marginal claims, section 6146 again bears a rational relation to the legislative objective of reducing insurance costs.

Finally, section 6146's limits are rationally related to the MICRA scheme in yet another respect. In order to reduce malpractice insurance costs, MICRA incorporated a number of provisions that place special limits on, or that at least may tend to reduce, a malpractice plaintiff's recovery, provisions that are not applicable to other personal injury plaintiffs. (See, e.g., Civ. Code, §§ 3333.2, subd. (b) [limiting recovery for noneconomic losses to $250,000]; 3333.1, subd. (a) [authorizing admission of evidence of "collateral source benefits"].) The Legislature may reasonably have concluded that a limitation on contingency fees in this field was an "appropriate means of protecting the already diminished compensation" of such plaintiffs from further reduction by high contingency fees. (See *Johnson* v. *St. Vincent Hospital, Inc.*, *supra*, 404 N.E.2d 585, 602-603.) Accordingly, there is no merit to plaintiffs' initial equal protection claim.[9]

Plaintiffs alternatively contend that the statute violates equal protection because it places limits on the fees that *plaintiffs'* attorneys may charge but imposes no limits on *defense* counsel's fees. As we have already seen, there are a host of statutes—both in California and in other jurisdictions—that place similar limits on contingency fees without limiting attorney fees that are earned on some other basis. Here, as in those instances, the Legislature could have determined that there was a special need (1) to protect plaintiffs from having their recoveries diminished by high contingency fees, and (2) "to reduce the temptation to adopt improper methods of prosecution which contracts for large fees contingent upon success have sometimes been supposed to encourage." (*Calhoun* v. *Massie*, *supra*, 253 U.S. at p. 174 [64 L.Ed. at p. 846].)[10]

---

[9]As already noted, a number of the medical malpractice reform statutes enacted in the mid-1970s imposed limits on attorney fees which apply only to medical malpractice litigation. Most courts that have addressed equal protection challenges to such provisions have rejected the challenges. (See, e.g., *Johnson* v. *St. Vincent Hospital, Inc.*, *supra*, 404 N.E.2d 585, 602; *DiFilippo* v. *Beck*, *supra*, 520 F.Supp. 1009, 1016.) To our knowledge, only one case has sustained such an attack (*Carson* v. *Maurer* (1980) 120 N.H. 925 [424 A.2d 825, 838-839, 12 A.L.R.4th 1]), and in *Carson* the court applied an "intermediate scrutiny" equal protection standard that is inconsistent with the standard applied by this court in *American Bank* and *Barme*. Indeed, in *American Bank* we noted that of the twenty-six state courts that had passed on equal protection challenges to recent medical malpractice legislation, *Carson* was one of only three that had sustained the challenge. (See 36 Cal.3d at p. 370, fn. 10.)

[10]The dissent's suggestion that a statute which draws a distinction between plaintiffs' and defendants' attorney fees violates the First Amendment's ban on "content discrimination" (*post*, pp. 939-941), not only is unsupported by any authority, but is also quite shortsighted. Numerous statutes contain provisions authorizing successful plaintiffs to recover attorney fees under circumstances in which successful defendants may not so recover. (See, e.g.,

Finally, plaintiffs argue that the decreasing-sliding-scale component of section 6146 unconstitutionally discriminates against more seriously injured malpractice victims. They suggest that in light of the lower percentage fee which the statute authorizes for higher recoveries, the provision makes it more difficult to obtain an attorney who will be willing to undertake the additional effort required to obtain such awards. As we have already noted, however, the Legislature could reasonably have concluded that the sliding-scale approach in fact produces more equitable fees than the traditional flat contingency fee, helping to ensure that an attorney does not obtain a "windfall" simply because his client is very seriously injured and guaranteeing that the most seriously injured plaintiffs will retain the lion's share of any recovery secured on their behalf.[11]

## C

Plaintiffs' final claim is that section 6146 violates the separation of powers doctrine. They argue that in light of this court's inherent power to review attorney fee contracts and to prevent overreaching and unfairness (see, e.g., *Bushman* v. *State Bar* (1974) 11 Cal.3d 558, 563-564 [113 Cal.Rptr. 904, 522 P.2d 312]), the question of the appropriateness of attorney fees is a matter committed solely to the judicial branch. But, as we have seen, legislative bodies have imposed limits on attorney fees in a variety of fields throughout our history. Applicable California authority expressly refutes the claim that the Legislature has no power to act in this setting. (See *Estate of Goodrich, supra,* 6 Cal.App. 730, 732. See generally *Brydonjack* v. *State Bar* (1929) 208 Cal. 439, 443 [281 P. 1018, 66 A.L.R. 1507].)[12]

*Christiansburg Garment Co.* v. *EEOC* (1978) 434 U.S. 412, 417-422 [54 L.Ed.2d 648, 653-657, 98 S.Ct. 694] [federal civil rights action]; Code Civ. Proc., § 1021.5 [private attorney general action].) Surely, the dissent does not intend to suggest that all such statutes are unconstitutional.

[11] The case of *Echlin* v. *Superior Court* (1939) 13 Cal.2d 368 [90 P.2d 63, 124 A.L.R. 719], provides no support for plaintiffs' equal protection contention. In *Echlin,* we addressed a provision which purported to give attorneys retained on a contingency basis greater rights vis-à-vis their clients than other attorneys, requiring a client who employed a lawyer under a contingency fee contract to pay the lawyer a sum fixed by the court before the client could dismiss the lawyer and replace him with another. The *Echlin* court invalidated the provision, finding that it was arbitrary to provide this special advantage to attorneys employed on contingency fees. That holding obviously does not suggest that a statute which limits the fees an attorney may charge when he represents a client on a contingency basis is constitutionally suspect or subject to any special, "rigorous" scrutiny.

[12] In *Heller* v. *Frankston* (1983) 76 Pa.Commw. 294 [464 A.2d 581, 584-587], an intermediate appellate court in Pennsylvania invalidated a statutory limitation on attorney fees contained in Pennsylvania's medical malpractice legislation as a violation of the separation of powers doctrine. In so holding, however, the court took no note of the numerous federal and state decisions upholding statutory limits on contingency fees in a variety of settings. The Pennsylvania Supreme Court took over the *Heller* case and ultimately affirmed the judgment on other grounds, without reaching the separation of powers issue. (*Heller* v. *Frankston* (Pa. 1984) 475 A.2d 1291.)

Accordingly, we conclude that plaintiffs' constitutional challenge to section 6146 is unfounded. The order appealed from is affirmed.

Broussard, J., Grodin, J., and Lucas, J., concurred.

**BIRD, C. J.**—I strongly dissent.

Unlike other sections of the Medical Injury Compensation Reform Act (MICRA) which have been upheld by this court, section 6146 of the Business and Professions Code (hereafter section 6146) implicates the fairness of the judicial process itself. (Compare *American Bank & Trust Co.* v. *Community Hospital* (1984) 36 Cal.3d 359 [204 Cal.Rptr. 671, 683 P.2d 670] [upholding periodic payment provision]; *Barme* v. *Wood* (1984) 37 Cal.3d 174 [207 Cal.Rptr. 816, 689 P.2d 446] [upholding elimination of collateral source subrogation rights].) In effect, section 6146 prohibits severely injured victims of medical negligence from paying the general market rate for legal services, while permitting defendants to pay whatever is necessary to obtain high quality representation.

Out of practical necessity, virtually all plaintiffs use contingent fee arrangements in medical malpractice cases. (See Reder, *Contingent Fees in Litigation with Special Reference to Medical Malpractice,* in The Economics of Medical Malpractice (Rottenberg edit. 1978) p. 224 [hereafter *Contingent Fees*]; see also U.S. Dept. of Health, Ed. & Welf., Rep. of Secretary's Com. on Medical Malpractice (1973) p. 32 [hereafter *HEW Report*].) In fact, for clients of limited means "the contingent fee arrangement offers the only realistic hope of establishing a legal claim." (*Fracasse* v. *Brent* (1972) 6 Cal.3d 784, 792 [100 Cal.Rptr. 385, 494 P.2d 9]; see also Aronson, *Attorney-Client Fee Arrangements: Regulation and Review* (1982) 68 A.B.A.J. 284, 286; *Contingent Fees, supra,* at p. 231; Schwartz & Mitchell, *An Economic Analysis of the Contingent Fee in Personal-Injury Litigation* (1970) 22 Stan.L.Rev. 1125, 1125-1126; Ranii, *ABA Report Suggests Changes in Tort System,* National Law J. (Dec. 24, 1984) p. 6, col. 1; *ABA Agenda: Shepard Outlines His Goals,* 70 A.B.A.J. (Oct. 1984) p. 38 ["The contingent fee truly is the key to the courthouse for many, many of our citizens."].)

Section 6146 imposes heavy burdens on the ability of severely injured plaintiffs to obtain adequate legal representation. It sets forth a sliding scale of fee limits—the greater the recovery, the lower the allowable percentage. The effect of this approach is to impose drastically low limits on fees in precisely those cases which require a large recovery to make the plaintiff economically whole. For example, in a case involving a $1 million recovery, the allowable rate would be about 15 percent, less than half of the 33⅓

percent rate that is generally available outside the medical malpractice field. (See generally, *HEW Report, supra,* at p. 32; see also Cal. Auditor General, The Medical Malpractice Insurance Crisis in California (1975) p. 27 [hereafter *Report of the Auditor General*].)

Other provisions of MICRA interact with section 6146 to further discourage attorneys from representing severely injured plaintiffs. The collateral source provision (Civ. Code, § 3333.1, subd. (a)) can substantially reduce the damage award, and thus the contingent fee, without decreasing the attorney's workload.[1] The periodic payment provision (Code Civ. Proc., § 667.7) may have the same effect and, in addition, could delay the attorney's compensation for years.[2] Further, the $250,000 limit on noneconomic damages (Civ. Code, § 3333.2) sharply reduces the recovery without relieving the attorney of the most difficult aspects of the malpractice action—proving negligence and causation.[3]

Since section 6146 affects only medical malpractice cases, attorneys may avoid these problems by refusing to represent medical malpractice victims. Only those lawyers not sufficiently competent or well-established to attract unrestricted business have any financial incentive to represent a severely injured medical malpractice victim. (See *Contingent Fees, supra,* at p. 219.)[4]

Section 6146 hampers a victim's ability to obtain high quality legal representation precisely in those cases where such representation is most essential. Defendants can be expected to concentrate their legal resources on

---

[1] Civil Code section 3333.1, subdivision (a) permits the introduction of evidence concerning collateral source payments, such as disability insurance, to medical malpractice plaintiffs. The jury may then reduce the damage award by that amount. This provision does not lessen the plaintiff attorneys' job of proving negligence, causation, and damages.

[2] Section 667.7 of the Code of Civil Procedure provides that in cases involving awards of $50,000 or more in "future damages," the court must, upon request of either party, order that this portion of the award be paid in periodic installments. If the plaintiff dies before receiving the entire award, the remainder, with the exception of damages for loss of future earnings, reverts to the defendant. (See *American Bank & Trust Co.* v. *Community Hospital, supra,* 36 Cal.3d at p. 368, fn. 8.)

The precise impact of section 667.7 on attorney fees is open to question, since the statute does not explicitly preclude the possibility that the attorney fees could be paid in a lump sum at the time of judgment.

[3] It is noteworthy that 60 percent of lawyers polled recently, including both plaintiff and defense attorneys, opposed a medical malpractice bill which will be introduced in the 99th Congress. Seventy-nine percent of those opposed to the bill felt that it would unfairly restrict the scope of damages an injured patient can recover. (Reskin, *Lawyers Oppose Medical Malpractice Bill,* 71 A.B.A.J. (Jan. 1985) p. 40.)

[4] "[A] limit on the percentage that a lawyer may retain of a gross recovery is a 100 percent marginal tax on earnings per dollar of gross recovery." (*Contingent Fees, supra,* at p. 219, fn. 24.) Obviously, such a tax creates a powerful disincentive to work on covered cases.

the potential high recovery cases. The statute prohibits plaintiffs from responding in kind. Hence, the legal contest becomes a lopsided mismatch with tort victims on the losing end.

This problem is aggravated by the fact that medical malpractice plaintiffs are even more in need of high quality legal representation than other personal injury plaintiffs. Even MICRA's principal sponsor has acknowledged that "a malpractice case is extremely difficult to prove, demands a great deal of research into causal factors and exhausts a tremendous amount of time on the part of the attorney." (Keene, *California's Medical Malpractice Crisis,* in A Legislator's Guide to the Medical Malpractice Issue (Warren & Merritt edits. 1976) pp. 29-30 [hereafter *California's Medical Malpractice Crisis*].)

Further, the risk of a zero recovery is high, and the fees collected in successful cases must also compensate the attorney for his or her work on the unsuccessful ones. (See, e.g., *Auditor General's Report, supra,* at p. 28 [50 percent of medical malpractice cases are disposed of with no recovery]; *Contingent Fees, supra,* at p. 227 [of the malpractice claims that go to trial, 60 percent obtain zero gross recovery].)[5]

Plaintiffs advance three constitutional arguments. They argue that section 6146: (1) infringes on their right to petition the government for redress of grievances and discriminates between litigants according to the content of the views they seek to present to the courts; (2) violates due process by infringing on the right of malpractice victims to retain counsel and by exacerbating the conflict of interest between an attorney and client; and (3) violates equal protection by arbitrarily applying attorney fee limitations only in medical malpractice cases, only to the *plaintiffs* in those cases, and in a manner particularly burdensome to severely injured malpractice victims with limited means.

I.

Plaintiffs urge that the fee limits imposed by section 6146 infringe on their constitutional right to petition the government for redress of griev-

---

[5]The majority imply that the high rate of zero recovery in medical malpractice cases is due to an inordinate number of frivolous or meritless claims. (Maj. opn., *ante,* at p. 931.) The more likely explanation is that there is a "salient difference between litigation for medical malpractice and other forms of accident liability." (Green, *Medical Malpractice and the Propensity to Litigate,* in The Economics of Medical Malpractice, *supra,* at p. 194 [hereafter *Propensity to Litigate*].) Modern medicine is highly complex and technical, and there is often a significant lag time between the date of the wrongful act and the date an injury is perceived. These factors present special difficulties in gathering evidence and proving negligence in medical malpractice cases. (*Id.,* at pp. 196-197.)

ances. They contend that their ability to obtain competent legal representation, which is essential for the effective prosecution of a medical malpractice complaint, is heavily burdened. Further, they suggest that selective imposition of restrictions on "person[s] *seeking* damages" for injuries due to medical malpractice (§ 6146, italics added) impermissibly discriminates among litigants according to the content of the views they wish to present to the courts. *Only plaintiffs* are prohibited from hiring attorneys at the market rate, while defendants are free to pay any amount—by contingent fee or otherwise—which may be necessary to obtain quality representation.[6]

The right of petition is protected by the 1st and 14th Amendments to the United States Constitution and article I, section 3 of the California Constitution. It encompasses the right of access to the courts for the resolution of civil disputes between private parties. (See, e.g., *California Transport* v. *Trucking Unlimited* (1972) 404 U.S. 508, 510-511 [30 L.Ed.2d 642, 646, 92 S.Ct. 609]; *United Transportation Union* v. *Michigan Bar* (1971) 401 U.S. 576, 578-579 [28 L.Ed.2d 339, 343, 91 S.Ct. 1076]; *City of Long Beach* v. *Bozek* (1982) 31 Cal.3d 527, 532-534 [183 Cal.Rptr. 86, 645 P.2d 137], vacated [on other grounds] (1983) 459 U.S. 1095 [74 L.Ed.2d 943, 103 S.Ct. 712], opn. reiterated on remand (1983) 33 Cal.3d 727 [190 Cal.Rptr. 918, 661 P.2d 1072].)

Litigants are entitled to petition the courts not only to advocate changes in public policy, but also to obtain monetary compensation. (See, e.g., *Mine Workers* v. *Illinois Bar Assn.* (1967) 389 U.S. 217, 223 [19 L.Ed.2d 426, 431, 88 S.Ct. 353]; *Railroad Trainmen* v. *Virginia Bar* (1964) 377 U.S. 1, 8 [12 L.Ed.2d 89, 94, 84 S.Ct. 1113, 11 A.L.R.3d 1196]; *City of Long Beach* v. *Bozek, supra,* 31 Cal.3d at p. 534; *Payne* v. *Superior Court* (1976) 17 Cal.3d 908, 914 [132 Cal.Rptr. 405, 553 P.2d 565].)

As a general matter, the Legislature may regulate commercial activities. (See, e.g., *Williamson* v. *Lee Optical Co.* (1955) 348 U.S. 483, 488 [99 L.Ed. 563, 572, 75 S.Ct. 461]; *United States Steel Corp.* v. *Public Utilities*

---

[6]The majority dismiss this contention by analogizing to California's ban on contingent fees for legislative lobbyists. (Maj. opn., *ante,* at p. 927, fn. 5; Gov. Code, § 86205, subd. (f).) This analogy is not persuasive for several reasons. First, there is no evidence that such a ban selectively disadvantages any interest group in the political process. I would hope that a total ban on contingent attorney fees in malpractice or personal injury litigation would raise concerns even for the majority, since it would clearly prevent all but wealthy victims from pursuing claims. Second, the term "contingent fee" as used in the context of this case is somewhat different from its use in the lobbyist statute. Unlike attorneys, lobbyists do not normally vie to recover a specific sum of money, a percentage of which could readily be paid to them. Third, the ban on contingent fees for lobbyists applies across the board to representatives of *all* viewpoints. Surely, the majority would not argue that a ban on contingent fees only for those who lobby on behalf of medical malpractice victims would be permissible.

*Com.* (1981) 29 Cal.3d 603, 613 [175 Cal.Rptr. 169, 629 P.2d 1381].) However, economic activity that is essential to the effective exercise of a First Amendment right may be restricted *only* where necessary to serve a compelling governmental interest. For example, in *Buckley* v. *Valeo* (1976) 424 U.S. 1, 51-54 [46 L.Ed.2d 659, 706-708, 96 S.Ct. 612], the Supreme Court struck down a statutory limit on the amount a political candidate could spend on his campaign. The First Amendment was implicated because political advocacy required the expenditure of funds to pay for the use of the electronic media. (*Id.,* at pp. 35-39 [46 L.Ed.2d at pp. 696-699]; see also *Citizens Against Rent Control* v. *Berkeley* (1981) 454 U.S. 290, 296, fn. 5 [70 L.Ed.2d 492, 499, 102 S.Ct. 434].) Here, in the judicial context, the expenditure of money for attorney fees is no less essential to the exercise of First Amendment rights.

In what appears to be the only reported decision that directly addresses a First Amendment challenge, a federal district court issued a preliminary injunction barring the enforcement of a limit on attorney fees in cases where veterans seek death and disability benefits. (See *National Ass'n of Radiation Survivors* v. *Walters* (N.D.Cal. 1984) 589 F.Supp. 1302, 1323-1327, 1329, *Walters* v. *National Assoc. of Rad. Survivors* (1984) — U.S. — [83 L.Ed.2d 698, 105 S.Ct. 588] [prob. jurisdiction noted], — U.S. — [82 L.Ed.2d 908, 105 S.Ct. 11] [stay granted by Rehnquist, J.], — U.S. — [83 L.Ed.2d 178, 105 S.Ct. 238] [request to vacate stay denied by court] [hereafter *Walters*].)[7]

The *Walters* opinion warrants extensive quotation. "While the Supreme Court has never directly addressed the question presented here, its cases establish the principle that the First Amendment rights to petition, association and speech protect efforts by organizations and individuals to obtain effective legal representation of their constituents or themselves. In particular, it has held that the First Amendment rights of petition, speech, and association protect union members' efforts to, through their union, advise injured workers to obtain legal advice and to recommend specific lawyers [citation]; a union's employment of a salaried attorney to represent its members in workers' compensation litigation [citation]; and to employ counsel to represent members, to furnish names of injured members to attorneys, and to accept compensation for soliciting clients for counsel [citations] . . . . The Court has explicitly declared that the principle underlying this series of cases should be applied broadly to protect First Amendment rights:

---

[7]The fee constraint in *Walters,* a $10 maximum, is drastically lower than the limits allowed by section 6146. However, it may be argued that the limit in *Walters* was enacted to protect veterans from overreaching when they are dealing with a government agency, the Veteran's Administration, which has as its very purpose the advancement of veterans' interests.

[¶] '. . . . The common thread running through our decisions . . . is that collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment. However, that right would be a hollow promise if courts could deny associations of workers or others the means of enabling their members to meet the costs of legal representation.' *United Transportation Union, [supra,]* 401 U.S. at 585-86, 91 S.Ct. at 1082-83. [¶] *It is evident that the First Amendment protects individuals' rights to obtain the adequate legal representation necessary to ensure their rights of petition, access to the courts, and association, just as it protects organizations' rights to such representation.* As the Supreme Court made clear in *Bates* v. *State Bar of Arizona,* 433 U.S. 350, 376, 97 S.Ct. 2691, 2705 n. 32, 53 L.Ed.2d 810 n. 32 (1977) the principle underlying the NAACP and union solicitation cases extends to individual efforts to obtain legal assistance. The Court was protecting the organization's [*sic*] efforts because the organizations were working on behalf of their members: [¶] 'Underlying [these cases] was the Court's concern that the aggrieved receive information regarding their legal rights and the means of effectuating them. *This concern applies with at least as much force to aggrieved individuals as it does to groups.*' 433 U.S. at 376 n. 32, 97 S.Ct. at 2705 n. 32. . . .'' (*Walters, supra,* 589 F.Supp. at pp. 1324-1325, italics added.)

Compare the principal cases relied upon by the majority. They were all decided <u>before 1930</u>. (See maj. opn., *ante,* at pp. 926-927.) *None addressed the right to petition.*[8] This omission is not surprising considering that, as one commentator has argued, the First Amendment was largely forgotten at that time. (See Rabban, *The First Amendment in its Forgotten Years* (1981) 90 Yale L.J. 514, 521 & fn. 21.)

By contrast, the cases relied upon by plaintiffs were all decided after the United States Supreme Court had taken on the task of interpreting and enforcing the guarantees of free speech and petition. (See, e.g., cases cited *ante,* at pp. 926-927.) Judge Patel's opinion in *Walters, supra,* 589 F.Supp. 1302, carefully analyzed this body of First Amendment jurisprudence and concluded that an attorney fee limit infringed on the right of petition. I believe her conclusion is sound.

---

[8] The majority place particular reliance on *Calhoun* v. *Massie* (1920) 253 U.S. 170 [64 L.Ed. 843, 40 S.Ct. 474], in which the Supreme Court concluded that "[t]he constitutionality of [attorney fee regulation] . . . resembling in its nature the exercise of the police power, has long been settled." (*Id.,* at p. 174 [64 L.Ed. at p. 846], quoted by the majority, *ante,* at p. 927.)

In relying on this line of reasoning, the majority ignore the more recently articulated principle that laws which actually affect the exercise of First Amendment freedoms cannot be sustained merely because they deal with some evil within the state's legislative competence. (*Mine Workers* v. *Illinois Bar Assn., supra,* 389 U.S. at p. 222 [19 L.Ed.2d at pp. 430-431].)

Since representation by counsel is essential to the effective exercise of an individual's First Amendment rights to petition and to access, the right to obtain counsel can only be restricted where necessary to achieve a compelling state interest.

The attorney-fee limitation should be subjected to particularly vigorous scrutiny since it also runs afoul of the constitutional ban on content discrimination. In regulating the exercise of First Amendment rights, the government may not pick and choose what views may be heard. (See *Police Department of Chicago* v. *Mosley* (1972) 408 U.S. 92, 95-96 [33 L.Ed.2d 212, 216-217, 92 S.Ct. 2286]; *Environmental Planning & Information Council* v. *Superior Court* (1984) 36 Cal.3d 188, 197 [203 Cal.Rptr. 127, 680 P.2d 1086].)

Section 6146 facially discriminates against persons desiring to prove medical negligence. It restricts only the fees that may be paid by "any person *seeking* damages in connection with an action for injury or damage against a health care provider based upon such person's alleged professional negligence . . . ." (Italics added.) It leaves intact a defendant's right to pay fees—contingent or otherwise—of any amount consistent with general law.[9]

Two justifications are advanced in support of section 6146. The first is that the limits are necessary to ensure that plaintiffs receive a greater percentage of the recovery. The second is that the statute serves the overall purpose of MICRA—the preservation of medical malpractice insurance. Neither of these justifications withstands strict scrutiny.

---

[9] If the statute also restricted the use of contingent fees by defendants, it would still be vulnerable to a challenge. Such additional restrictions would have no practical effect since defendants utilize hourly or per diem fee arrangements.

It is noteworthy that the disparate treatment of plaintiffs and defendants has led some commentators to conclude that the fee restrictions were specifically *intended* to restrict plaintiffs' access to the courts. (See Jenkins & Schweinfurth, *California's Medical Injury Compensation Reform Act: An Equal Protection Challenge* (1979) 52 So.Cal.L.Rev. 829, 944, fn. 696 [hereafter *California's MICRA*]; see also *Contingent Fees, supra,* at p. 215 ["[T]he effect of limiting attorney fees is, quite intentionally, to discourage use of attorney time in prosecuting malpractice claims."].) This argument appears particularly compelling when the fee restrictions are viewed in the context of other MICRA provisions, which forthrightly provide special relief to healthcare providers and their insurers at the expense of medical malpractice victims. (See, e.g., Civ. Code, § 3333.2 [limit on noneconomic damages in medical malpractice actions]; Civ. Code, § 3333.1 [abrogation of the collateral-source rule in medical malpractice actions]; Code Civ. Proc., § 667.7 [periodic payment of medical malpractice judgments].)

Normally, the question of legislative motivation does not arise where—as here—a restriction is facially discriminatory. Such enactments are subject to strict scrutiny. However, since the majority have declined to recognize this problem (see maj. opn., *ante,* at p. 932), I point out this additional difficulty. Some distinguished commentators have suggested that facially neutral restrictions enacted for the purpose of restricting content should be subjected to the strictest form of scrutiny. (See, e.g., Tribe, American Constitutional Law (1978) pp. 591-594; Ely, Democracy and Distrust (1980) pp. 111-115.)

Allowing plaintiffs to retain a greater percentage of their recovery is a legitimate interest. However, it is *not* a compelling one. As explained by the court in *Walters,* such a paternalistic argument is disfavored in the context of the First Amendment. (See *Walters, supra,* 589 F.Supp. at p. 1327.) It is entirely inappropriate for the state to "protect" an individual by suppressing his or her exercise of a First Amendment right.

Moreover, section 6146 is not necessary to protect a plaintiff's recovery. Section 6146 will often operate to force the early settlement of meritorious claims, resulting in a *reduction* in a plaintiff's recovery in many cases. (See *post,* at pp. 944-946.) Curiously, in cases involving serious injuries with potentially large recoveries, attorneys may be discouraged from taking meritorious cases to trial even though to do so might significantly increase the plaintiff's recovery. In cases involving smaller potential recoveries, section 6146 may actually *increase* the attorney's contingent fee since the fee schedule set out in section 6146 can be expected "to provide a floor, as well as a ceiling, on the percentage rate charged." (Comment, *Of Ethics and Economics: Contingent Percentage Fees for Legal Services* (1983) 16 Akron L.Rev. 747, 755 [hereafter *Ethics and Economics*].)

It is also argued that section 6146 serves MICRA's overall purpose of preserving medical malpractice insurance. In this view, limits on contingent fees will reduce the amount of damages that insurers are required to pay. Assuming arguendo that the preservation of medical malpractice premiums is a compelling state interest, the attorney fee limits are by no means necessary to serve that interest.

Section 6146 will provide little, if any, relief to insurers. Since attorney fees are paid out of the *plaintiff's* recovery, fee limitations merely reapportion the award between the plaintiff and his or her attorney. Juries are prohibited from considering attorney fees in making damage awards. (*Bauguess v. Paine* (1978) 22 Cal.3d 626, 634 [150 Cal.Rptr. 461, 586 P.2d 942].) The available evidence indicates that this prohibition is effective. (See *California's MICRA, supra,* at p. 943, and sources cited therein.)

Section 6146 can provide relief to defendants and their insurers only by forcing plaintiffs to settle claims for amounts far below their actual value and/or by reducing the number of claims filed. Indeed, at the time that MICRA was enacted, the Auditor General pointed out that "[u]nless the amount of medical malpractice settlements continue[s] to increase in the future there will be *little if any effect* on medical malpractice rates as a result of limitations imposed on attorney contingency fees." (*Report of the Auditor General, supra,* at p. 30, italics added.) Indeed, because section 6146 provides defense attorneys with an incentive to run up costs in cases

with potentially large recoveries (see *post,* p. 947), section 6146 may be expected to *increase* malpractice premiums.

Section 6146 significantly infringes on plaintiff's First Amendment right to petition and does so based on the content of a plaintiff's claim. Therefore, it must be shown to be necessary to achieve a compelling state interest. Defendant has not met this burden. Accordingly, section 6146 is invalid.

## II.

Next, plaintiffs contend that section 6146 violates plaintiffs' right to due process of law. "The due process clauses, federal and state, are the most basic substantive checks on government's power to act unfairly or oppressively." (*Hale* v. *Morgan* (1978) 22 Cal.3d 388, 398 [149 Cal.Rptr. 375, 584 P.2d 512].) Due process requires that legislation be "reasonable and proper," not "arbitrary and oppressive." (*Id.,* at p. 399.) The limits imposed by section 6146 must be rationally related to the Legislature's purposes in enacting the statute.

The majority conclude that limiting the compensation that plaintiffs' attorney may receive does not violate due process because it "does not in any way abrogate the right to retain counsel." (Maj. opn., *ante,* at p. 926.) However, section 6146 *does* significantly interfere with the right of certain victims of medical malpractice to retain counsel. (*Ante,* at pp. 934-938.) Further, it exacerbates the conflict of interest between plaintiffs and their attorneys inherent in the contingent fee arrangement.

In support of their holding, the majority cite a number of existing attorney-fee limits which have withstood legal challenge. (Maj. opn., *ante,* at p. 926.) However, these limits can in no way be compared to the severe limits imposed by section 6146.

First, the majority note that attorney fees are legislatively regulated in California in both worker compensation proceedings and in probate matters. As one commentator has noted, these schemes are easily distinguishable from section 6146. (*California's MICRA, supra,* at p. 945.) Under the Workers' Compensation Act, injured parties do not have to prove negligence. (Lab. Code, § 3600.) Hence, the attorney faces far less risk of a zero recovery. Moreover, the statute provides for "[a] reasonable attorney's fee," which allows a judge the flexibility to fix a fee which takes into consideration the complexity of the case and the time and effort of the attorney. (Lab. Code, § 4903.) Under the Probate Code, an attorney is compensated for the actual work done for the estate. (Prob. Code, §§ 900, 910, 911.) The only way an attorney could fail to receive compensation is

if he or she does no work. The Probate Code also allows a judge to recognize an attorney's extraordinary services by an award of fees. (Prob. Code, § 910, subd. (a).) In short, fee restrictions in the workers compensation and probate contexts are not likely to discourage attorneys from working in those fields, since the legal work is relatively simple, the risks are low and compensation is available which is commensurate to the services performed.

Contrast this situation with that of the plaintiff's attorney in a malpractice action with a contingent fee arrangement. The attorney will receive no compensation unless there is a recovery in the case. One study indicates that over 400 attorney hours are spent on the average malpractice case which results in a "zero recovery" after trial. (*Contingent Fees, supra,* at p. 218, fn. 22.) Faced with the combined effect of the fee limitation and other MICRA provisions (e.g., the collateral source provisions (§ 3333.1), the $250,000 ceiling on noneconomic damages (Civ. Code, § 3333.2), and the periodic installment provision (Code Civ. Proc., § 667.7), many attorneys can be expected to cease to represent malpractice victims with valid claims. As a result, the most severely injured clients may be unable to secure representation, especially if their cases involve complex or difficult factual issues, problems of proof, or expensive expert testimony.

The majority stress that in some states (e.g., New Jersey and New York) limits on the contingent fees available to attorneys in *all* personal injury action have been upheld. (Maj. opn., *ante,* at p. 926.) However, rather than lending support to the majority's position, reference to the New Jersey and New York schemes highlights two of the most pernicious aspects of section 6146.

First, section 6146 singles out and imposes a burden on only one narrow subclass of personal injury victims. Attorneys may still find ample unrestricted work elsewhere. When the risks and cost associated with general personal injury work are not as great as for medical malpractice, and the potential compensation is much greater, common sense tells us that attorneys will abandon the medical malpractice field. By contrast, the New Jersey and New York schemes restrict broad fields of practice, leaving attorneys little room for escape. (See, e.g., *American Trial Lawyers Ass'n* v. *New Jersey S. Ct.,* (1974) 66 N.J. 258 [330 A.2d 350, 351, fn. 3] [all tort actions other than subrogation claims]; *Gair* v. *Peck* (1959) 6 N.Y.2d 97 [188 N.Y.S.2d 491, 160 N.E.2d 43, 45, fn. 1, 77 A.L.R.2d 390] [all personal injury and wrongful death actions].)[10]

---

[10]The majority also state that California's scheme is "not usually low." (Maj. opn., *ante,* at p. 928.) As the majority concede, the New Jersey scheme would allow a greater recovery

Second, unlike the New Jersey and New York schemes, section 6146 has no provision for higher fees in exceptionally difficult cases. Section 6146 would prohibit a plaintiff from exceeding the limits even where the difficulty of his or her case is so great that a lawyer could not be retained at the specified maximums. (Compare *American Trial Lawyers Ass'n* v. *New Jersey S. Ct., supra,* 316 A.2d 19, 28 [upholding contingent fee limits in part because exceptions are permitted in special circumstances]; *Gair* v. *Peck, supra,* 160 N.E.2d at p. 53 [same].)

Similarly, the attorney fee limits imposed for actions brought under the Federal Tort Claims Act are distinguishable from the limits imposed by section 6146. The Federal Tort Claims Act applies only to *claims against the government.* Because of federal concepts of sovereign immunity, the government has been free to prohibit any tort claims against itself. While such claims are now allowed, some limitations on those claims have been justified as reasonable exercises of the police power. By contrast, section 6146 operates to limit the right of individuals to contract for representation in actions between private parties. The limitations cannot be justified by references to "protect[ing] the Treasury from frauds and imposition." (Maj. opn., *ante,* at p. 926, quoting *Calhoun* v. *Massie, supra,* 253 U.S. at p. 173 [64 L.Ed. at p. 843].) Instead, section 6146 directly interferes with the judicial process by imposing an unfair disadvantage on one party in a legal dispute.

Section 6146 violates due process because it is not sufficiently related to the purposes it was enacted to achieve. Instead of protecting plaintiffs' recoveries, it operates to reduce them. Instead of reducing the number of frivolous claims, it restricts the number of meritorious claims by limiting medical malpractice victims' access to adequate representation.

Simple calculations indicate that section 6146 will often operate to discourage litigation in a manner which results in a *reduction* rather than an increase in a plaintiff's recovery. An example serves to illustrate the point. This example assumes a medical malpractice case which would result in a $250,000 verdict after trial.

---

in the case before this court than is available under MICRA. (*Id.,* fn. 6.) More importantly, New Jersey's rule allows attorney fees to be awarded in excess of the limits in exceptional cases. (See *American Trial Lawyers Ass'n* v. *New Jersey S. Ct.* (1974) 126 N.J.Super. 577 [316 A.2d 19 at p. 28].)

The maximum percentages prescribed under the federal statutes which limit attorney fees would allow attorney fees of over $100,000 in this case. (See 28 U.S.C. § 2678 [Federal Tort Claims Act provides for a fee of 25 percent after court action and 20 percent of any recovery obtained prior to such action]; 42 U.S.C. § 406(b)(1) [Social Security Act provides for reasonable fees not in excess of 25 percent of plaintiff's recovery].) In any event, as discussed, *post,* (dis. opn. at p. 944) these statutory schemes are distinguishable from section 6146.

Studies indicate that plaintiffs who settle before trial receive approximately 75 percent of their potential verdict. (Danzon & Lillard, *Settlement Out of Court: The Disposition of Medical Malpractice Claims* (1983) 12 J. Legal Stud. 345, 375.) Plaintiffs and amici note that, prior to MICRA, most plaintiff attorneys employed contingent fee agreements in which the attorney received a greater percentage of the recovery if the case proceeded to trial than if it settled before trial—typically 25 percent to 33 percent if the case settled and 40 percent or more if the case went to trial.[11]

Prior to the enactment of section 6146, the $250,000 hypothetical case which went to trial would yield approximately $150,000 for the plaintiff and $100,000 for the plaintiff's attorney, assuming that the attorney received a 40 percent contingent fee. If the same case had settled prior to trial for 75 percent of its value or $187,500, the plaintiff would have received approximately $125,062 and the plaintiff's attorney $62,437, assuming a 33⅓ percent contingent fee. Since the increase in compensation for the attorney might be over $37,000, the plaintiff's attorney obviously had a strong incentive prior to MICRA to ensure that the victim was more fully compensated for his or her injury.

Under section 6146 a $250,000 verdict would yield $183,350 to the plaintiff and $66,650 to the plaintiff's attorney, assuming the attorney received the maximum fee permitted by section 6146.[12] If the case settled prior to trial for 75 percent of its value or $187,500, plaintiff's attorney might charge according to the guidelines of section 6146 rather than his or her former fee schedule to avoid the loss of income caused by MICRA. Under this scenario, plaintiff would receive $128,975 and his attorney $58,525. (See Note, *Ethics and Economics, supra,* 16 Akron L.Rev. at p. 755 ["While [maximum fees schedules] are intended to eliminate the disproportionate fee an attorney might take from large recoveries, in practice they tend to provide a floor, as well as a ceiling, on the percentage rate charged"].)

Hence, after MICRA, if the case settles before trial, the attorney's compensation is not significantly less than if the case had gone to trial. However, the plaintiff's recovery is reduced by almost $55,000. The plaintiff in a malpractice case which settles before trial may recover little more than half

---

[11]In this case, the plaintiffs and their attorneys had contracted for a 25 percent contingent fee. The trial court expressly noted that that fee was "reasonable," and would have been awarded were it not for the restrictions imposed by section 6146.

[12]This hypothetical does not take into account the possible reduction in recovery which results from the application of Civil Code section 3333.1, which abrogates the collateral source rule. When section 3333.1 is applied, plaintiff's recovery will be even smaller, with a corresponding reduction in plaintiff's attorney's fee.

his or her actual damages—a smaller percentage and less in absolute terms than would have been received prior to the enactment of section 6146.

This illustration demonstrates how section 6146 exacerbates the conflict of interest between plaintiffs and their attorneys in contingent fee arrangements. (See maj. opn., *ante,* at pp. 928-929.) After MICRA, although a plaintiff might significantly increase his or her recovery by going to trial, the marginal increase in attorney fees might not cover the expenses involved in producing expert witnesses, marshalling exhibits, and conducting the trial itself. The pressure on a plaintiff's attorney to settle a meritorious case before trial is overwhelming.

Thus, section 6146 will produce a greater number of settlements with lower recoveries. However, it will do so at a heavy price both to the injured plaintiff and his or her relationship with the attorney. Rather than helping the malpractice victim as the majority contend, section 6146 will often result in a *smaller* recovery for the plaintiff and a significant ethical dilemma for the attorney. "Limits on contingent fees decrease settlement size, increase the likelihood that a case is dropped, and decrease the likelihood of litigation to verdict. . . . [F]ee constraints will limit expenditure on litigation at the cost of reduced compensation to plaintiffs." (Danzon & Lillard, *Settlement Out of Court: The Disposition of Medical Malpractice Claims, supra,* 12 J. Legal Stud. at p. 375.) These results are exactly contrary to those forecast by the majority.[13]

---

[13]As the following table demonstrates, a reduced recovery for a plaintiff is likely whether the value of the case is large or small. All calculations are based on a pre-MICRA fee schedule of 40 percent to the attorney after trial, and 33⅓ percent to the attorney if the case is settled before trial. Post-MICRA calculations assume the application of the maximum fees allowable under section 6146.

| TOTAL DAMAGES | | Pre-MICRA | | Post-MICRA | |
| --- | --- | --- | --- | --- | --- |
| | | After Trial | Settled Before Trial | After Trial | Settled Before Trial |
| $1,000,000 | Total Paid | $1,000,000 | $750,000 | $750,000* | $562,500 |
| including $500,000 | Plaintiff's Recovery | $ 600,000 | $500,250 | $633,350 | $464,600 |
| noneconomic damages) | Attorney's Fee | $ 400,000 (40%) | $249,750 (33⅓%) | $116,650 (15.5%) | $ 97,900 (17.5%) |
| $   50,000 | Total Paid | $   50,000 | $ 37,500 | $ 50,000 | $ 47,500 |
| | Plaintiff's Recovery | $   30,000 | $ 25,012 | $ 30,000 | $ 22,500 |
| | Attorney's Fee | $   20,000 (40%) | $ 12,487 (33⅓%) | $ 20,000 (40%) | $ 15,000 (40%) |

*Civil Code section 3333.2 imposes a $250,000 ceiling on noneconomic damages.

Thus, the injured plaintiff in a case with $1 million in damages who settles before trial

As for reducing the number of claims filed, it appears that health care providers believed prior to MICRA that the use of contingent fee arrangements in medical malpractice cases encouraged the filing of claims which would otherwise not have been made. (See Rottenberg, *Introduction,* in The Economics of Medical Malpractice, *supra,* p. 7; Comment, *Recent Medical Malpractice Legislation—A First Checkup* (1976) 50 Tulane L.Rev. 655, at p. 670.)

In at least one respect, the health care providers were probably right. "[C]ontingent fees have indeed 'contributed' to the recent [medical malpractice] crisis to one limited, but very important extent; *i.e.,* they have opened the courthouse door for those who could not otherwise afford an attorney." (Aitken, *Medical Malpractice: The Alleged "Crisis" in Perspective* (1975) 3 Western St.U.L.Rev. 27, 36.)

While discouraging frivolous and meritless suits is a legitimate state interest, there is no evidence that the number of frivolous claims in the medical malpractice field is high, or that such claims contribute to the cost of medical malpractice premiums. On the contrary, the difficulty in proving medical malpractice and the high risk of zero recovery make attorneys very selective about the cases they are willing to pursue. (See Comment, *Recent Medical Malpractice Legislation—A First Checkup, supra,* 50 Tulane L.Rev. at p. 671; Rottenberg, *Introduction,* in The Economics of Medical Malpractice, *supra,* at pp. 7-8; *Propensity to Litigate, supra,* at pp. 194-197.) Even insurers have acknowledged that attorneys reject the vast majority of malpractice claims they see. (See, e.g., *Criteria Lawyers Use in Accepting or Rejecting Medical Malpractice Cases,* Malpractice Digest [published by St. Paul Fire and Marine Insurance Company for its medical liability insurance policyholders], (Sept/Oct 1978) at p. 2; see generally *Propensity to Litigate, supra,* at p. 194.)

The absence of any evidence that prior to the enactment of MICRA there was an inordinate number of frivolous medical malpractice claims filed strongly suggests that section 6146 actually operates to discourage the filing of *meritorious* claims. The attempt to reduce malpractice premiums by reducing the number of meritorious malpractice claims filed is exactly the sort of "arbitrary and oppressive" legislative action which the due process guar-

---

may receive $97,400 less under section 6146 than he or she would have before MICRA. Plaintiff's attorney's fee may be reduced by over $300,000, to less than 25 percent of the former available fee. It is little wonder attorneys may be unwilling to pursue such claims at all.

The injured plaintiff in a case with a small recovery ($50,000) may receive $5,625 less under section 6146 than prior to MICRA. The plaintiff's attorney in the small recovery may receive a greater percentage of the recovery *after* MICRA, because of the "floor" effect of section 6146. (See *Ethics and Economics, supra,* 16 Akron L.Rev. at p. 755.)

antees must operate to prevent. (See *Hale* v. *Morgan, supra,* 22 Cal.3d at pp. 398-399.)

In fact, rather than *lowering* premiums, section 6146 may work to *increase* them. While section 6146 discourages attorneys from representing medical malpractice plaintiffs in cases involving extensive damages, it encourages defense attorneys to devote their utmost time to these very cases. While the costs involved encourage plaintiffs to settle cases, defense attorneys, who are paid on a per diem basis, can afford to undertake extensive and costly discovery prior to settlement. Thus, defendants can exert even greater pressure on plaintiffs to settle cases for a minimum recovery or to drop suits completely.

Hence, rather than lowering malpractice premiums, the increased defense costs which may result from this legislatively created legal mismatch, and which are paid directly by the insurance companies, may operate to *increase* malpractice premiums. What rational basis can there possibly be for attempting to lower malpractice premiums by creating an incentive to increase the cost of malpractice defense?

The attorney fee limitations imposed by section 6146 reduce plaintiffs' recoveries, exacerbate the conflict of interest between attorneys and their clients, and restrict the filing of meritorious claims. The statute does not bear a reasonable relationship to the legislative purposes of protecting plaintiffs' recoveries and lowering malpractice premiums. Thus, it violates the due process guarantees of the state and federal Constitutions.

### III.

Section 6146 also violates the equal protection clause of the California Constitution. (Cal. Const., art. I, § 7.) Section 6146 creates several classifications. First, it affects only those tort victims who are injured by medical malpractice. Second, it disproportionately burdens the most seriously injured medical malpractice victims. Third, it places restrictions only on medical malpractice *plaintiffs,* not defendants.

Plaintiffs and amici argue that this court should apply strict or intermediate judicial scrutiny to determine whether section 6146 violates equal protection. They assert that that section affects two fundamental interests—the right to petition the government (see, e.g., *California Transport* v. *Trucking Unlimited, supra,* 404 U.S. 508, 510-511 [30 L.Ed.2d 642, 646]) and the due process right to retain counsel (see, e.g., *Mendoza* v. *Small Claims Court* (1958) 49 Cal.2d 668, 673 [321 P.2d 9])—and classifies on a suspect

basis—wealth (see *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 597-598 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187]).

As discussed previously, I would hold that the fee limits not only implicate the rights of petition and due process, but also violate them independently of the equal protection guarantee. Moreover, section 6146 selectively burdens a group defined—practically, if not intentionally—on suspect grounds. Although several groups are burdened by section 6146, *only plaintiffs of modest means are truly unable to escape its restrictions*. For these plaintiffs, the sole feasible method of financing protracted and expensive malpractice litigation is to "borrow" from the hoped-for recovery. (See *Contingent Fees, supra,* at p. 224 and discussion *ante,* p. 934.) By contrast, affluent plaintiffs, as well as defendants, can evade the limits by contracting for legal services on an hourly basis.

Plaintiffs correctly observe that in reviewing legislation that affects fundamental rights, this court has regarded the disparate imposition of burdens according to wealth as an additional factor warranting strict scrutiny. (See, e.g., *Serrano* v. *Priest, supra,* 5 Cal.3d at pp. 593-598.) In my view, plaintiffs' argument for some level of heightened scrutiny has merit. However, I find it unnecessary to reach this contention since section 6146 cannot withstand any meaningful level of judicial review.

To pass the equal protection rational basis test under the California Constitution, legislative classifications must bear a "substantial and rational" relation to a legitimate state purpose. (*Brown* v. *Merlo* (1973) 8 Cal.3d 855, 872-873, 882 [106 Cal.Rptr. 388, 506 P.2d 212, 66 A.L.R.3d 505].) In determining the purpose of the statute, the reviewing court decides whether the asserted goal is *realistically* conceivable. (*Cooper* v. *Bray* (1978) 21 Cal.3d 841, 848 [148 Cal.Rptr. 148, 582 P.2d 604].) And, the court must conduct "*a serious and genuine judicial inquiry* into the correspondence between the classification and the legislative goals." (*Ibid.,* italics in original; see also *Newland* v. *Board of Governors* (1977) 19 Cal.3d 705, 711 [139 Cal.Rptr. 620, 566 P.2d 254].)

In *Carson* v. *Maurer* (1980) 120 N.H. 925 [424 A.2d 825, 12 A.L.R.4th 1] [hereafter *Carson*], the New Hampshire Supreme Court overturned a similar contingent fee scale for attorneys representing medical malpractice plaintiffs. Applying "intermediate" scrutiny, the court reasoned that "[t]he regulation of attorney's fees solely in the area of medical malpractice inevitably will make such cases less attractive to the plaintiff bar. Consequently, [the statute] 'will at least somewhat deter the litigation of legitimate causes of actions, thus creating a potential impediment to injured individuals' access to courts and counsel.'" (*Id.,* at p. 839.)

Also, in *Heller* v. *Frankston* (1983) 76 Pa.Commw. 294 [464 A.2d 581], the court invalidated fee legislation similar to section 6146 on separation of powers grounds. Though the court did not reach the equal protection issue, it cited *Carson, supra,* 424 A.2d 825 in a favorable manner. (*Id.,* at p. 586, fn. 12.)[14]

Three justifications are advanced in support of section 6146. First, it is asserted that section 6146 serves the legitimate purpose of ensuring that the plaintiff receives the bulk of the recovery. (*California's Medical Malpractice Crisis, supra,* at p. 31.) However, if this is the purpose, there is no rational basis to single out medical malpractice contingent fees for special treatment. (Cf. *Echlin* v. *Superior Court, supra,* 13 Cal.2d 368, 374-375 [invalidating regulation of some but not all contingent fees where the evil sought to be avoided was characteristic of all attorney fees];[15] see also *Carson, supra,* 424 A.2d at p. 839.)

Indeed, the section's narrow reach negates any protective effect by permitting attorneys to avoid the restrictions by seeking work from the great majority of tort victims who are not covered by the fee restrictions. By contrast, statutes that have been upheld on this rationale do not leave enough unrestricted areas of private practice to permit the wholesale abandonment of covered plaintiffs. (See, e.g., *American Trial Lawyers Ass'n* v. *New Jersey S. Ct., supra,* 330 A.2d 350; *Gair* v. *Peck, supra,* 160 N.E.2d 43.) In such cases, the only person "protected" by the statute is the negligent defendant who escapes liability because the plaintiff is unable to obtain representation.

The majority assert that the special burdens imposed on medical malpractice victims are justified by the legitimate purpose of reducing medical malpractice premiums. It is hypothesized that plaintiffs might be willing to settle for lower total recoveries if they pay a smaller percentage in attorney fees.

---

[14]Two courts have upheld similar contingent fee limits. (See *Johnson* v. *St. Vincent Hospital, Inc.* (1980) 273 Ind. 374 [404 N.E.2d 585, 602-603]; *DiFilippo* v. *Beck* (D.Del. 1981) 520 F.Supp. 1009, 1012.) The majority suggest no reason why these decisions are more consistent with the California Constitution than *Carson.* At a minimum, the gravity of the affected interests and the relatively suspect character of the statutory classifications underscore the necessity for a meaningful level of judicial review. However, neither of these courts considered the full impact of selective fee limits on the fairness of the judicial process.

[15]In *Echlin,* this court struck down a statute which classified on the basis of the nature of the attorney fees contract. Attorneys who were to receive a contingent fee other than money were not protected by the statute. The court found "no natural, intrinsic or constitutional distinction justifying such discrimination" and held the statute void. (*Echlin* v. *Superior Court, supra,* 13 Cal.2d at p. 375.) The majority fail to adequately explain why section 6146, which restricts only contingent fee agreements but no other form of contract for payment of attorneys' fees, is not as arbitrary and invalid as the statute at issue in *Echlin.* (See maj. opn. at p. 932, fn. 10.)

(See maj. opn., *ante,* at p. 931.) However, this argument ignores the reality created by this statute.

Section 6146 is grossly underinclusive with regard to the objective of reducing premiums. It is not disputed that defendant and plaintiff legal fees consume about the same proportion of the premium dollar. (See *California's MICRA, supra,* at p. 943, fn. 687.) Furthermore, according to a systematic study of medical malpractice attorney fees, plaintiff fees are *not* significantly greater than defendant fees. (See *HEW Report, supra,* at p. 33.) Hence, there is no rational basis for cutting costs by restricting plaintiffs while leaving defendants free from restrictions.

Indeed, restrictions on defense fees would yield a far greater potential reduction on premiums than equivalent restrictions on plaintiff fees. Defense fees are paid directly out of insurance funds. A $1 reduction in the fee could yield a $1 reduction in premiums. By contrast, plaintiff fees are paid out of the plaintiff's recovery. The costs to the insurance company for any given amount of recovery are the same regardless of the size of the fee. (See generally, *California's MICRA, supra,* at p. 943.) Hence, the relation between plaintiff fees and premiums is—as the majority impliedly admit—speculative and indirect.

Second, the majority suggest that the Legislature may properly limit contingent fees in order to discourage frivolous suits. (Maj. opn., *ante,* at p. 931.) However, this purpose is not consistent with the narrow reach of the statute. The danger of frivolous suits is not confined to the medical malpractice area. Indeed, the exceptionally difficult and risky character of medical malpractice litigation provides lawyers with an extra incentive to screen out frivolous claims.[16]

Finally, the majority point out that plaintiffs in medical malpractice actions are subject to various other provisions of MICRA that limit their recoveries. Hence, "[t]he Legislature may reasonably have concluded that a limitation on contingency fees in this field was an 'appropriate means of protecting the already diminished compensation' of such plaintiffs from further reduction by high contingency fees." (Maj. opn., *ante,* at p. 932.)

---

[16]Ironically, the majority grasp at the high rate of zero recoveries to support the notion that there are special problems of unregulated fees in the medical malpractice area. It is suggested that the high incidence of failure might indicate that an unusually large proportion of frivolous claims were filed.

This creative theory ignores the fact—not seriously disputed by anyone—that once a rate of failure becomes known, lawyers take it into account in choosing whether or not to accept a case. Naturally, a high risk of failure discourages attorneys from bringing frivolous claims which yield no attorney fees, and which yield no recoupment for the high discovery and trial preparation costs which attorneys must incur in handling such cases.

This theory exhibits a kind of cruel humor. According to the majority, the Legislature, having severely reduced malpractice victims' compensation, decided to "protect" plaintiffs from further reductions by prohibiting them from paying the market rate for legal representation. Unfortunately for malpractice victims—and for the majority's theory—the Legislature omitted to ensure that plaintiffs could obtain adequate legal services at the rates specified by section 6146, or that plaintiffs would actually retain a higher percentage of their recoveries.

If anything, MICRA's other provisions provide a rational basis for *higher* contingent rates in the medical malpractice area. As explained above, several of these provisions reduce the plaintiff's recovery without decreasing his or her attorney's workload. (See *ante,* at p. 935.) Hence, to obtain the same fees that are available to them elsewhere, attorneys would have to charge higher percentage rates.

In my view, the statute cannot withstand any meaningful level of judicial scrutiny. The selective imposition of restrictions on medical malpractice victims' ability to hire competent attorneys cannot rationally be reconciled with any of the asserted purposes. Accordingly, I would hold that section 6146 violates the equal protection guarantee of the California Constitution.[17]

## IV.

By inhibiting the ability of medical malpractice plaintiffs—but not defendants—to contract for legal representation, section 6146 directly implicates the fairness of the judicial process. In a misguided effort to lower malpractice premiums, section 6146 restricts victims' access to the courts based on the content rather than the merit of their claims, reduces the recovery for medical negligence to far below a plaintiff's actual damages, and discriminates against the most severely injured victims, particularly those of limited means—all under the guise of "protecting" malpractice plaintiffs.

Section 6146 infringes on fundamental First Amendment rights and violates both the due process and the equal protection guarantees of the Con-

---

[17]The majority have also provided no guidance to plaintiffs in this case about the rate at which they will be permitted to contract with their attorneys for representation against the remaining defendants. While the claims against the present defendants have settled, the claims against the other defendants remain to be litigated. If the plaintiffs are limited to paying their attorneys only 10 percent of any further recovery, the level of representation will undoubtedly have to be severely curtailed, assuming the attorneys can afford to continue representation. Section 6146 limits the fees an attorney may collect for representation against "*a* health care provider" (italics added). Since the statute refers to a single defendant, it must be presumed that the limitations imposed by section 6146 apply separately to the recoveries against each individual defendant, rather than to the aggregate recovery.

stitution. The relationship between its purposes and the means used to achieve those purposes is so tenuous and speculative, and the harm caused by the provision so apparent, that it cannot withstand judicial scrutiny.

By upholding section 6146, the majority do a grave injustice to victims of medical malpractice in this state and to well-established principles of constitutional law.

Mosk, J., and McClosky, J.,* concurred.

Appellants' petition for a rehearing was denied May 8, 1985, and the opinion was modified to read as printed above. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.