126 N.J. Super. 577 (1974)
316 A.2d 19
AMERICAN TRIAL LAWYERS ASSOCIATION, NEW JERSEY BRANCH, TRIAL ATTORNEYS OF NEW JERSEY, AND TRIAL LAWYERS ASSOCIATION OF MIDDLESEX COUNTY, INDIVIDUALLY AND AS CLASS REPRESENTATIVES OF MEMBERS OF THE PLAINTIFF ORGANIZATIONS, WHICH CLASSES ARE ALSO PLAINTIFFS-RESPONDENTS,
v.
NEW JERSEY SUPREME COURT, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 27, 1973.
Decided February 14, 1974.
*579 Before Judges KOLOVSKY, FRITZ and CRANE.
Mr. Stephen Skillman, First Assistant Attorney General, argued the cause for appellant (Mr. George F. Kugler, Jr., Attorney General, attorney).
Mr. Alexander M. Bickel of the Massachusetts Bar, admitted pro hac vice, and Mr. Morris M. Schnitzer argued the cause for respondents (Messrs. Schnitzer and Schnitzer, and Mr. William O. Barnes, Jr., attorneys).
The opinion of the court was delivered by KOLOVSKY, P.J.A.D.
On December 21, 1971 the New Jersey Supreme Court adopted a rule, to be effective January 31, 1972, regulating "contingent fee arrangements" in tort litigation. R. 1:21-7. Plaintiffs first instituted an action in the United States District Court for the District of New Jersey attacking the validity of the rule. That action pends in that court awaiting the conclusion of these proceedings, which plaintiffs thereafter instituted, challenging the validity of the rule on state constitutional grounds. American Trial Law. Ass'n N.J. Branch v. New Jersey S.Ct., 409 U.S. 467, 93 S.Ct. 627, 34 L.Ed. 651 (1973).
*580 The action in the state court came on for disposition before a judge of the Law Division. Plaintiffs offered no evidence in support of their multi-pronged attack on the rule, advising the court that
After due deliberation, it is our submission that we are entitled to prevail upon the record in its present posture and would, therefore, decline to offer evidence at a trial before Your Honor.
The Law Division judge ruled  contrary to what plaintiffs contended  that (1) the adoption of a rule regulating contingent fee arrangements is within the power granted to the Supreme Court by Article VI, section II, paragraph 3 of the Constitution of 1947, and (2) the exercise by the Supreme Court of its rule-making power "is analogous to legislation, an exercise of constitutional authority by a separate branch of government," thus rendering inapplicable to judicial review of the rule "the body of administrative law with its constitutional postulate of findings of facts grounded in a record [citations omitted] [which] has developed out of legislative delegation to agencies within the executive branch of government."
Further, the judge held that a rule adopted by the Supreme Court "is reviewable, as legislation is, to determine the test of substantive due process of law, that is, whether it is in reasonable furtherance of the public health, safety or welfare. A presumption of validity should favor it."
The trial judge acknowledged that the problem of contingent fees in tort litigation had been of concern to the Supreme Court for some 15 years before the rule was adopted. Further, the judge recognized that in the summer of 1971 the court had published a proposed rule and had solicited comments thereon from members of the Bar; that it had held a public hearing on the proposed rule on November 6, 1971, at which objections to the proposed rule were presented by representatives of the New Jersey State Bar Association, the several county bar associations, and the Trial Lawyers Association of New Jersey; and that, after considering *581 the objections, both oral and written, offered by members of the Bar, it had amended the rule as originally proposed and had adopted it in its present form on December 21, 1971.
Nevertheless, and despite the trial judge's purported recognition that there is a presumption that the rule is valid and reasonable, he apparently deemed of no significance plaintiffs' refusal to offer any evidence, and concluded:
Rule 1:21-7(c) establishes a 33 1/3% contingent fee on recoveries above $50,000 as unconscionable and unethical, except in special cases warranting relief under subsection (f). Contrary to such a priori determination was the prevalence of the 33 1/3% contingent fee in this State and elsewhere before its effective date. The challenged rule's interference with freedom of contract and its restriction on attorneys' incomes is without support in the record or in matters subject to judicial notice. No information as to widespread abuse or complaints is before this court, no data from which an inference may be drawn that 33 1/3% contingent fees on recoveries above $50,000 are so out of proportion to the value of attorneys' services as to be unreasonable.
Judgment is rendered holding Rule 1:21-7(c) invalid on State constitutional grounds.
This appeal is from that judgment. We reverse because we are satisfied not only that there is no merit to plaintiffs' arguments  iterated on appeal although rejected in the trial court  that the Supreme Court lacked power to adopt any regulation of contingent fee arrangements and that the procedures used by it in adopting the rule were improper, but also that, in the absence of any evidence that the schedule of maximum contingent fees embodied in the rule was unreasonable, the trial judge had no warrant for concluding that the rule violated the constitutional right of attorneys to freedom of contract.
The contingent fee rule, R. 1:21-7, as clarified by a directive issued by the Supreme Court on April 13, 1972, applies to all matters, whether the case is to be litigated in the state or federal courts in New Jersey, in which the client's claim for damages is based upon the alleged tortious conduct *582 of another, including products liability claims. It does not apply when the client is a subrogee. Nor does it "apply to `business torts' such as fraud or conspiracy to interfere with contractual relationships." It does include "all typical negligence cases, such as auto accidents, product liability and `slip and fall.'"
"Contingent fee arrangement" as used in the rule means an agreement for an attorney's legal services "under which compensation, contingent in whole or in part upon the successful accomplishment or disposition of the subject matter of the agreement, is to be in an amount which either is fixed or is to be determined under a formula."
Paragraph (b) of the rule provides:
An attorney shall not enter into a contingent fee arrangement without first having advised the client of the right and afforded the client an opportunity to retain him under an arrangement whereby he would be compensated on the basis of the reasonable value of his services.
Paragraph (c) provides that in cases to which the rule is applicable
* * * an attorney shall not contract for, charge, or collect a contingent fee in excess of the following limits:
(1) 50% on the first $1000 recovered;
(2) 40% on the next $2000 recovered;
(3) 33-1/3% on the next $47,000 recovered;
(4) 20% on the next $50,000 recovered;
(5) 10% on any amount recovered over $100,000; and
(6) where the amount recovered is for the benefit of an infant or incompetent and the matter is settled without trial the foregoing limits shall apply, except that the fee on any amount recovered up to $50,000 shall not exceed 25%.
(Paragraph (e) makes it clear that attorneys are not precluded from entering into contingent fee arrangements providing for lower percentages.)
Paragraph (d) of the rule provides for computation of the contingent fee on the net sum recovered "after deducting [specified] disbursements in connection with the institution *583 and prosecution of the claim * * *." No deduction need be made for hospital and medical liens or similar items. The paragraph concludes:
The permissible fee shall include legal services rendered on any appeal or review proceeding or on any retrial, but this shall not be deemed to require an attorney to take an appeal.
Paragraph (f) deals with the situation where the attorney deems the fee permitted by paragraph (c) to be inadequate and provides:
If at the conclusion of a matter an attorney considers the fee permitted by paragraph (c) to be inadequate, an application on written notice to the client may be made to the Assignment Judge for the hearing and determining of a reasonable fee in light of all the circumstances. * * * This rule shall not preclude the exercise of a client's existing right to a court review of the reasonableness of an attorney's fee.
Paragraph (g) requires that the contingent fee agreement be in writing and that a signed duplicate thereof be delivered to the client. Pursuant to an administrative directive, any provision reserving the right to the attorney to proceed for a greater fee under R. 1:21-7(f) must be included in the writing. Upon successful conclusion of the litigation, a signed closing statement, in the form prescribed by the Administrative Director of the Courts, must be delivered to the client.
The rule thus defines the outer limits of permissible contingent fees in tort litigation, at the same time providing, by paragraph (f), a procedure by which attorneys who deem the circumstances of a particular case to reasonably warrant a fee greater than that authorized by the rule, to apply for court approval of the larger fee.
Plaintiffs contend that the Supreme Court lacks constitutional power to adopt any rule regulating contingent fees; indeed, "that the New Jersey Constitution does not grant rule making power [to the Supreme Court] in the matter of admission to practice and discipline of the Bar."
*584 The New Jersey Constitution of 1947 divides "the powers of the government * * * among three distinct branches, the legislative, executive, and judicial." Art. III, par. 1. It vests the "judicial power * * * in a Supreme Court, a Superior Court, County Courts and inferior courts of limited jurisdiction," the last of which "may from time to time be established, altered or abolished by law." Art. VI, § I, par. 1.
The Constitution further provides that the Supreme Court, consisting of a Chief Justice and six Associate Justices (Art. VI, § II, par. 1) "shall exercise appellate jurisdiction in the last resort in all causes provided in this Constitution" (Art. VI, § II, par. 2) and that
The Supreme Court shall make rules governing the administration of all courts in the State and, subject to the law, the practice and procedure in all such courts. The Supreme Court shall have jurisdiction over the admission to the practice of law and the discipline of persons admitted. [Art. VI, § II, par. 3]
Plaintiffs argue that since there is no reference to rule-making in the second sentence of the quoted paragraph 3, the Supreme Court may not exercise the jurisdiction granted thereby "over the admission to the practice of law and the discipline of persons admitted" legislatively, i.e., by adopting rules of general application thereto. Instead, plaintiffs argue, that jurisdiction, particularly insofar as it applies to the regulation of the conduct of a member of the Bar and his relationship to his clients, may be exercised only in adjudicatory proceedings, in litigation instituted to discipline an attorney or to review the reasonableness of a fee charged by the attorney in a specific case.
To accept plaintiffs' argument would be to invalidate all rules of general application adopted by the Supreme Court regulating the professional conduct of attorneys and their relationships to their clients and to the courts. Included among those rules, in addition to the contingency fee rule, are rules: regulating bar examinations and the licensing of *585 attorneys (R. 1:23 to 27); specifying who may practice law and appear in court (R. 1:21-1 to 4); authorizing attorneys to form "professional corporations" to engage in the practice of the law (R. 1:21-1A); creating a committee on the unauthorized practice of the law (R. 1:22); setting forth limitations on the practice of law by attorneys holding various public offices and positions (R. 1:15); adopting a canon of professional ethics (R. 1:14); creating an advisory committee on professional ethics (R. 1:19); regulating ethics committees and disciplinary proceedings (R. 1:20); requiring attorneys to maintain separate trustee and business bank accounts and specified bookkeeping records (R. 1:21-6), and providing for the creation and maintenance of a "client's security fund" to which each member of the bar must annually contribute the sum of $15 (R. 1:28).
We do not accept plaintiffs' argument because we are convinced it is frivolous.
"That the States have broad power to regulate the practice of law is, of course, beyond question." United Mine W. of A. Dist. 12 v. Illinois St. Bar Ass'n, 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967). United Mine also recognizes that the "broad power" may be exercised by the adoption of "broad rules framed to protect the public and to preserve respect for the administration of justice."
By Art. VI, § II, par. 3, the Constitution makes the Supreme Court the exclusive repository of the State's power to regulate the practice of the law, investing it "with exclusive responsibility in this area." State v. Rush, 46 N.J. 399, 411 (1966).
Nothing in the language of the constitutional provision or in the proceedings leading to its adoption furnishes even a scintilla of support for an assumption that the framers of the Constitution, when they granted the Supreme Court the exclusive responsibility of regulating the practice of the law, at the same time intended to and did deprive it of the long-recognized inherent power of courts to do so by adopting *586 reasonable rules of general application governing the professional conduct of attorneys, both in and out of court.
The cases uniformly support the statement in 7 C.J.S., Attorney and Client, § 58 at 843 that:
The power of the court to make reasonable rules and regulations regarding the conduct of attorneys is not open to question.
See In re Rothman, 12 N.J. 528, 535 (1953); Collins v. Godfrey, 324 Mass. 574, 87 N.E.2d 838 (Sup. Jud. Ct. 1949); In re Member of Bar, 257 A.2d 382 (Del. Sup. Ct. 1969), app. dism., In re Reed, 396 U.S. 274, 90 S.Ct. 562, 24 L.Ed.2d 461 (1970); Barton v. State Bar of California, 209 Cal. 677, 289 P. 818, 819 (Sup. Ct. 1930); Gair v. Peck, 6 N.Y.2d 97, 188 N.Y.S.2d 491, 160 N.E.2d 43 (Ct. App. 1959), cert. den. 361 U.S. 374, 80 S.Ct. 401, 4 L.Ed.2d 380 (1960); Schlesinger v. Teitelbaum, 475 F.2d 137 (3 Cir.1973); see also, 7 Am. Jur.2d, Attorneys at Law, § 2 at 44.
As the Supreme Judicial Court of Massachusetts said in Collins v. Godfrey, supra, in sustaining the validity of one of its rules restricting the practice of law by judicial personnel:
Only the court can determine whether any member of the bar has been guilty of improper conduct, and only the court can decide what consequences shall be visited upon him. Ex parte Secombe, 19 How. 9, 13, 15 L.Ed. 565. It would be strange indeed if the judicial department, having such powers of investigation and discipline to the extent of professional death over its own officers, when it becomes aware of a custom or practice among some of them which tends to undermine public confidence in the administration of justice, should be reduced to the mere expedient of imposing consequences upon individuals for past conduct, a recourse which, as in the instance before us, might be so grossly unfair that it could not be considered. The judicial department is not helpless in the face of such a situation. Neither is it obliged to call the legislative department to its assistance. In its own proper field it is able to stand alone. Without going farther than is necessary to decide the case before us, we believe that whenever it appears that, in the practice of the law, methods, customs, or habits have grown up among members of the bar which are undermining the confidence of the public in the courts and so are hampering the judicial department in the performance of its constitutional *587 duties, that department has the power to proceed in a sensible way to eradicate the evil by laying down a rule for future guidance without prosecuting any individual. [87 N.E.2d 841; emphasis added]
We are convinced that the power so vested in the Supreme Court to regulate the practice of the law includes the power to adopt a reasonable rule establishing the outer limits of permissible contingent fees in tort litigation. Gair v. Peck, supra; Schlesinger v. Teitelbaum, supra.
In Gair v. Peck, supra, the New York Court of Appeals upheld the power of the Appellate Division, First Department, in the exercise of "their long standing `power and control over attorneys and counsellors at law and all persons practicing or assuming to practice law,'" to adopt a rule embodying a schedule of reasonable fees relating to "Contingent Fees in Claims and Actions for Personal Injury and Wrongful Death." In doing so, the court said:
The rule-making power is not limited to prescribing only the specific case after the event. The idea that imposition by lawyers on their clients, oppressive and unconscionable fee agreements or similar conduct is beyond the rule-making power of the court has no shadow of foundation. The idea is frivolous that disciplinary power over attorneys is unrelated to the exaction of excessive fees. Nor are the Appellate Divisions so helpless as to be denied the power of censure or of taking more incisive disciplinary action to curb the practice of excessive exactions against clients merely for the reason that the client himself has not elected to contest payment of the fee. The duty and function of the Appellate Divisions to keep the house of the law in order does not hinge upon whether clients, worn down by injuries, delay, financial need and counsel holding the purse strings of settlement, knowing little about law or lawyers, have had the stamina to resist in court by hiring other lawyers to be paid out of the other half of the recovery for defending against the first lawyer. [188 N.Y.S.2d at 501, 160 N.E.2d at 51]
As Chief Justice Vanderbilt said in Steiner v. Stein, 2 N.J. 367 (1949):
By reason, however, of the confidential relation of client and attorney and because an attorney's position of trust as an officer of *588 the courts obligates him to the highest standard of fair dealing, equity has long exercised jurisdiction to supervise at the behest of the client an attorney's conduct toward his client. In so doing the Court of Chancery has invoked a variety of remedies ranging from the investigation of the fairness of any agreement between attorney and client to restraining actions at law, threatened or existing, and from revising or cancelling contracts for services to determining the just and reasonable sum due the attorney from his client. [at 372]
While contingent fees are permitted in New Jersey (Hassell v. Van Houten, 39 N.J. Eq. 105 (Ch. 1884)), they always have been subject to strict supervision by the courts. Colgan v. Jones, 44 N.J. Eq. 274 (E. & A. 1888); Soper v. Bilder, 87 N.J. Eq. 564 (Ch. 1917); Hughes v. Eisner, 8 N.J. Super. 351 (Ch. Div. 1950), rev'd 14 N.J. Super. 58 (App. Div. 1951), app. dism. 8 N.J. 228 (1951).
Leaving for later consideration the question of the reasonableness of the percentages set out in R. 1:21-7, we are satisfied that the rule is a permissible method of exercising the court's power over fee arrangements between attorneys and their clients by a rule of general application which provides advance notice to the Bar of the maximum fee the court deems to be fair under ordinary circumstances and at the same time provides protection to the client from overreaching more expeditiously than through case by case review of individual fees.
Plaintiffs next contend that even if the Supreme Court has the power to adopt a rule regulating contingent fee arrangements, an evidentiary hearing is a prerequisite to a valid promulgation thereof. The essence of plaintiffs' argument appears in the following quotation from their brief:
If otherwise constitutional, which we do not believe it would be, R. 1:21-7(c) could, to be sure, have been enacted by the legislature without any prior evidentiary hearing. But it was not. It was enacted by an agency  in this instance a court  exercising an administrative function. * * * Rate-setting is a legislative function and may be exercised by the legislature, but when exercised administratively it generally requires an evidentiary hearing. *589 The argument is without substance. No justification exists for plaintiffs' reliance in support thereof on cases involving administrative agencies to which the Legislature has delegated power, based on findings of fact, to adopt rules in particular areas. Even an administrative agency acting in accordance with delegated legislative authority may act legislatively without first conducting a hearing unless required to do so by statute. Pacific States Box & Basket Co. v. White, 296 U.S. 176, 56 S.Ct. 159, 80 L.Ed. 138 (1935).
Moreover, the Supreme Court, in adopting R. 1:27, was not acting as an administrative agency exercising powers delegated to it by the Legislature. Rather, it was exercising powers which the Constitution vested in it as one of the three branches of the government. Its action in adopting the rule, although action of the judicial branch, was "legislative in nature," Lathrop v. Donohue, 367 U.S. 820, 825, 81 S.Ct. 1826, 1828, 6 L.Ed.2d 1191 (1961), just as was the act of the Wisconsin Supreme Court in entering an order integrating the Wisconsin Bar, an order whose validity was sustained by the United States Supreme Court in Lathrop.
No evidentiary hearing and findings of fact based thereon  or indeed even a legislative type hearing such as the Supreme Court did hold on November 6, 1971  was required, any more than, as plaintiffs concede, it would have been required had the subject matter thereof been within the jurisdiction of the Legislature and the substance thereof embodied in a statute enacted by the Legislature. McDonald v. Board of Election Com'rs of Chicago, 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969).
As is the case with respect to all legislative action, the rule thus adopted by the Supreme Court in the exercise of its jurisdiction is presumed to be constitutional. "The presumption of reasonableness is with the State." Salsburg v. Maryland, 346 U.S. 545, 553, 74 S.Ct. 280, 284, 98 L.Ed. 281 (1954).
As the court said in Pacific States Box & Basket Co., supra:
*590 When * * * legislative action "is called in question, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of the existence of that state of facts, and one who assails the classification must carry the burden of showing by a resort to common knowledge, or other matters which may be judicially noticed, or to other legitimate proof, that the action is arbitrary." [56 S.Ct. at 163]
See also, Ind. Elec., etc., Ass'n v. N.J. Bd. of Ex'rs., Elec. Contr'rs, 48 N.J. 413, 423-424 (1967); N.J. Chap., Am. I.P. v. N.J. State Bd. of Prof. Planners, 48 N.J. 581, 599-600, app. dism. 389 U.S. 8, 88 S.Ct. 70, 19 L.Ed.2d 8 (1967); McDonald v. Board of Election Com'rs of Chicago, supra.
The presumption is applicable in cases of constitutional challenge to legislative measures placing limitations on fees and charges (see e.g. O'Gorman & Young v. Hartford Fire Ins. Co., 282 U.S. 251, 257, 51 S.Ct. 130, 132, 75 L.Ed. 324 (1931)), including limitations on the fees which attorneys may charge their clients with respect to various types of claims. Haberberger v. Myer, 4 N.J. 116, 125-126 (1950); Yeiser v. Dysart, 267 U.S. 540, 45 S.Ct. 399, 69 L.Ed. 775 (1925); Margolin v. United States, 269 U.S. 93, 46 S.Ct. 64, 70 L.Ed. 176 (1925); Randolph v. United States, 274 F. Supp. 200 (M.D.N.C. 1967), aff'd 389 U.S. 570, 88 S.Ct. 695, 19 L.Ed.2d 785 (1968); Gair v. Peck, supra; Schlesinger v. Teitelbaum, supra.
So here, a presumption of validity attached to the rule adopted by the Supreme Court. Even if the trial court gave no weight either (a) to the statements made by the members of the Supreme Court at the public hearing of November 6, 1971 as to the information they had that led them to the conclusion that the rule was necessary and reasonable,[1] or (b) to the failure of the objectors at that public hearing to accede to the Supreme Court's suggestions that they submit financial *591 and other data to show that the limitations of the rule were unfair, still the trial court was required to assume, in the absence of a contrary showing  and there was none  the existence of a state of facts which justified the adoption of the rule and that the limitations of the rule are reasonable. The trial court's ruling in effect placed the burden of proof on defendant.
That ruling was erroneous. Under settled law, to overcome the presumption of validity which attached to the rule, plaintiffs had the "burden of showing by a resort to common knowledge, or other matters which may be judicially noticed, or to other legitimate proof," Pacific States Box & Basket Co. v. White, supra, that the rule and the limitations set forth therein are in fact arbitrary and unreasonable. Since neither "common knowledge" nor other matters which may properly be judicially noticed shed any light on the factual issues here presented, it was plaintiffs' burden to offer proofs  and they expressly declined to do so  to rebut the presumption and to support the allegations in their initial pleading that:
R. 1:21-7(c) is in fact unreasonable, and therefore an arbitrary and unconstitutional, rate schedule for legal services, in that it is not fairly related to the contingent character of legal services performed for the plaintiffs in most tort cases, in which the recovery is over $50,000 or to the quantity, quality or value of such services in most tort cases and does not provide or allow fair and reasonable compensation for such services.
We conclude that there is no support in the record for the trial court's determinations that R. 1:21-7(c) is unreasonable and violates a right of freedom of contract protected by the New Jersey Constitution. Attorneys have never had the right to enforce contractual provisions for more than a fair and reasonable fee. They are not businessmen entitled to charge what the traffic will bear. "Membership in the bar is a privilege burdened with conditions." Matter of Rouss, 221 N.Y. 81, 84, 116 N.E. 782, 783 (Ct. App. 1917). "The court's control over a lawyer's professional life derives *592 from his relation to the responsibilities of a court." Theard v. United States, 354 U.S. 278, 281, 77 S.Ct. 1274, 1276, 1 L.Ed.2d 1342 (1957).
Plaintiffs next contend that the rule "denies the equal protection of the laws to lawyers and their clients" in violation of the New Jersey and United States Constitutions. They argue that the rule is unconstitutionally discriminatory because (1) "it singles out contingent fees from among the varieties of fee arrangements," (2) "it singles out contingent fees in negligence cases," and (3) it excludes subrogation claims from the control of the rule.
Altogether apart from the fact that there is no evidence to overcome the presumption that the classification is reasonable, Pacific States Box & Basket Co. v. White, supra, plaintiffs' argument ignores the settled rule that:
The constitutional mandate for equal protection does not mean that the regulation must reach every class to which it might be applied  that the Legislature must regulate all or none. The Legislature has wide discretion in the creation of or recognition of classes for different treatment. Equal protection does not require that all persons be dealt with identically. If there is some reasonable basis for the recognition of separate classes, and the disparate treatment of the classes has a rational relation to the object sought to be achieved by the lawmakers, the constitution is not offended. The transgression arises only when the classification rests upon grounds wholly irrelevant to achievement of the State's objective; the separate treatment must admit of but one conclusion beyond a rational doubt, i.e., that the basis therefor is arbitrary and unreasonable, and without relevance to the legislative goal. [N.J. Chap., Am. I.P. v. N.J. State Bd. of Prof. Planners, 48 N.J. 581, 601-602 (1967), app. dism. 389 U.S. 8, 88 S.Ct. 70, 19 L.Ed.2d 8 (1967)]
As the cases have recognized, contingent fee arrangements involve unique problems in the attorney-client relationship, including those arising from the establishment by contract of a method for compensation which bears no direct relationship either to the effort expended by the attorney or the actual value of the services. The separate treatment thereof is clearly justified; the classification is not arbitrary; it does not deny the equal protection of the law.
*593 Nor is the classification improper because the rule applies only to negligence claims, the area in which contingent fee arrangements are most commonly used.
The exclusion of subrogation claims from the operation of the rule is an obvious recognition of the fact that the client in the subrogation case is an insurance company whose bargaining strength, unlike that of individual clients, is sufficiently strong to eliminate the possibility of the imposition of excessive fees.
The added suggestion by plaintiffs in their argument that the rule somehow discriminates against the poor is frivolous and unsupported by the record.
Finally, we find no merit to plaintiffs' contention that the rule impairs the obligation of contingent fee contracts made and partly performed prior to January 31, 1972. Apart from the fact that, as noted above, it has long been recognized that attorneys' fee arrangements are subject to judicial scrutiny, "every contract is made subject to the implied condition that its fulfillment may be frustrated by a proper exercise of the police power." Veix v. Seneca B. & L. Ass'n, 126 N.J.L. 314, 320 (E. & A. 1940); see also Marcus Brown Holding Co. v. Feldman, 256 U.S. 170, 198, 41 S.Ct. 465, 466, 65 L.Ed. 877 (1921). The stated rule is fully applicable to fee contracts between an attorney and his client. Calhoun v. Massie, 253 U.S. 170, 40 S.Ct. 474, 476, 64 L.Ed. 843 (1920).
Moreover, the lack of substance in the contention that the retroactive application of R. 1:21-7 impairs the obligation of contract is underscored by the fact that any attorney who believes that the rule operates unfairly as to him may proceed, under R. 1:21-7(f), to seek court approval of a fee in an amount greater than that permitted by R. 1:21-7(c).
We are satisfied that, on the record here, it is clear that the challenged rule is valid and constitutional. The judgment of the Law Division is reversed.
NOTES
[1] The trial court's characterization of the determination implicit in R. 1:21-7(c) as an "a priori determination" is unwarranted.