**CITIZENS COALITION FOR TORT REFORM, INC., Appellant,**

v.

**Stephen A. McALPINE, Lt. Governor of the State of Alaska; Alaska Academy of Trial Lawyers, Appellees.**

No. S–3714.

Supreme Court of Alaska.

April 26, 1991.

carceration costs incurred by the state.

Michael L. Lessmeier, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for appellant.

Virginia B. Ragle, Asst. Atty. Gen., Douglas B. Baily, Atty. Gen., Juneau, for appellee McAlpine.

Avrum M. Gross, Gross & Burke, Juneau, for appellee Alaska Academy of Trial Lawyers.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

In this case the lieutenant governor denied certification of an initiative that would have set maximum allowable levels of attorney's fees in personal injury cases. The lieutenant governor found that the initiative was an attempt to prescribe a rule of court, a subject that the Alaska Constitution expressly restricts from the people's power to legislate by initiative. On a motion for summary judgment, the superior court upheld the lieutenant governor's decision. We affirm.

## I

In August 1987, Citizens Coalition for Tort Reform, Inc. ("Coalition") filed with Lieutenant Governor McAlpine an application for certification of an initiative entitled: "An Act relating to civil liability; and relating to contingency agreements in connection with personal injury actions."[1] Sections 1 and 2 of the initiative proposed to alter the statutory law governing apportionment of damages and contribution among tortfeasors. Section 3 of the initiative proposed to add the following new statute to AS 09.17:

(a) An attorney shall not contract for or collect a contingency fee for representing any person seeking damages in connection with an action for personal injury in excess of the following limits:

(1) Thirty-three and one-third percent of the first one hundred thousand dollars ($100,000) recovered;

(2) Twenty-five percent of the next one hundred thousand dollars ($100,000) recovered;

(3) Ten percent of any amount on which the recovery exceeds two hundred thousand dollars ($200,000).

Such limitations shall apply regardless of whether the recovery is by settlement, arbitration, or judgment, or whether the person for whom the recovery is made is a responsible adult, an infant, or a person of unsound mind.

(b) For purposes of this section:

(1) "Recovered" means the net sum recovered after deducting any disbursements or costs incurred in connection with prosecution or settlement of the claim. Costs of medical care incurred by the plaintiff and the attorney's office overhead costs or charges shall not be deductible disbursements or costs for such purposes.

After reviewing the initiative and a legal opinion on the initiative prepared by the attorney general, the lieutenant governor denied certification on October 11, 1987.

---

1. "An initiative is proposed by filing an application with the lieutenant governor." AS 15.45.-020. "The lieutenant governor shall review the application and shall either certify it or notify the initiative committee of the grounds for denial." AS 15.45.070.

The basis of denial was that the proposed regulation of attorney's fees in section 3 of the initiative constituted an attempt to prescribe a rule of court, a subject that both Article XI, section 7 of the Alaska Constitution and AS 15.45.010 restrict from the people's power to legislate by initiative.[2]

In November 1987, the Coalition filed a complaint in superior court seeking a temporary restraining order that would direct the lieutenant governor to certify the initiative and to prepare the initiative petitions. The Alaska Academy of Trial Lawyers ("AATL") intervened in the action, and they and the attorney general, appearing on behalf of the lieutenant governor, filed answers to the Coalition's complaint. After oral argument, the trial court denied the Coalition's motion for a temporary restraining order. We denied the Coalition's petition for review in December 1987.

The Coalition removed section 3 from the initiative and resubmitted it to the lieutenant governor, who certified it in that form. The voters adopted that truncated version of the initiative at the 1988 general election. Soon after the election, in February 1989, the Coalition resumed litigation over the lieutenant governor's refusal to certify the initiative in its original form by filing for summary judgment in the superior court. The Coalition sought a ruling that section 3 of the original initiative did not propose to enact a constitutionally or statutorily restricted court rule. The state and AATL filed cross motions for summary judgment. In August 1989, the superior court, Judge Karen L. Hunt, held that section 3 of the Coalition's original initiative

was "an attempt to prescribe a rule of Court, as that phrase is used in Article 11, Section 7, of the Constitution." Accordingly, the court denied the Coalition's motion and granted both cross motions. The superior court also awarded partial attorney's fees to the state and to AATL. The Coalition appealed.

## II

The primary dispute in this case presents two related questions of law. First, we must decide whether a limit on attorney contingent fees is necessarily classifiable as a rule of court. Second, if a contingent-fee limit is a rule of court, we must decide whether article XI, section 7 of the constitution removes such a rule from the scope of the people's power to legislate by initiative. We address each issue in turn.[3]

### A

As a threshold matter, the lieutenant governor and the superior court both decided that section 3 of the Coalition's proposed initiative constituted an attempt to prescribe a rule of court. On appeal, the state and AATL argue that the decisions below on this point were correct. In essence, those decisions and appellees' arguments all rely upon the conclusion that it is within this court's rule-making authority to prescribe a limit on contingent fees.

It is true that this court possesses extensive rule-making authority. The sources of that authority are two separate provisions

2. "The initiative shall not be used to dedicate revenues, make or repeal appropriations, create courts, define the jurisdiction of courts or prescribe their rules, or enact local or special legislation." Alaska Const. art. XI, § 7. Alaska Statute 15.45.010 provides that the people may exercise, through the initiative, the law-making powers of the legislature, subject to the same restrictions that appear in article XI, § 7.

3. The superior court granted summary judgment after deciding as a matter of law that section 3 of the proposed initiative included a constitutionally restricted subject. We review this appeal from the grant of summary judgment *de novo*. *Grand v. Municipality of Anchorage*, 753 P.2d 141, 143 n. 3 (Alaska 1988).

When reviewing questions of law *de novo*, the court's duty is to adopt the rule of law that is most persuasive in light of precedent, reason and policy. *Williford v. L.J. Carr Investments, Inc.*, 783 P.2d 235, 236 (Alaska 1989).

When construing constitutional provisions we are especially sensitive to policy concerns, because—as we explained in *Thomas v. Bailey*, 595 P.2d 1, 4 (Alaska 1979)—"a constitution is a document 'unchangeable by ordinary means,' *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed 60, 73 (1803), which 'must be considered as a living document adaptable to changing conditions and circumstances unanticipated at the time it was written.' *Warwick v. State ex rel. Chance*, 548 P.2d 384, 391 (Alaska 1976)."

of the state constitution. Article IV, section 15 of the constitution states:

> *Rule–Making Power.* The supreme court shall make and promulgate rules governing administration of all courts. It shall make and promulgate rules governing practice and procedure in civil and criminal cases in all courts. These rules may be changed by the legislature by two-thirds vote of the members elected to each house.

Alaska Const. art. IV, § 15. The court's rule-making power under this section is explicitly broad and very nearly complete. *Id.; see also Channel Flying, Inc. v. Bernhardt,* 451 P.2d 570, 575 (Alaska 1969) (legislature has no power to make rules governing practice and procedure in civil and criminal cases, only power to change court-made rules by two-thirds vote).

This court also obtains rule-making authority from article IV, section 1 of the constitution, which states:

> *Judicial Power and Jurisdiction.* The judicial power of the State is vested in a supreme court, a superior court, and the courts established by the legislature. The jurisdiction of courts shall be prescribed by law. The courts shall constitute a unified judicial system for operation and administration. Judicial districts shall be established by law.

Alaska Const. art. IV, § 1. The court's rule-making authority under this section is inherent in the judicial power vested in it, as the supreme court of the state.

One inherent judicial power that we have exercised repeatedly is the power to regulate the practice of law in the state. We have described the scope of this power generally in our decisions by striking down or disapproving statutes that conflict with attorney disciplinary rules we have promulgated. *See In re MacKay,* 416 P.2d 823, 829 (Alaska 1964) (statute in conflict with court rule "was unconstitutional for being an invasion of the inherent power of the court to discipline and disbar members of the Alaska Bar Association"), *cert. denied,* 384 U.S. 1003, 86 S.Ct. 1907, 16 L.Ed.2d 1016 (1966). We also have recognized that the judicial power specifically vests us with authority to determine standards for admission to the practice of law in the state, *e.g., In re Stephenson,* 511 P.2d 136 (Alaska 1973),[4] and to regulate the professional conduct of attorneys, *e.g., Miller v. Paul,* 615 P.2d 615 (Alaska 1980). And finally, in exercise of our inherent power, we have adopted rules that govern beyond the "administration ... practice and procedure" limitations of article IV, section 15, most notably the Alaska Bar Rules and the Code of Professional Responsibility.

Both the Alaska Bar Rules and the Code of Professional Responsibility already contain court rules that regulate contingent fees. Disciplinary Rule 2–106 of the Code of Professional Responsibility explicitly allows attorney-client contingent fee agreements, but prohibits any fee that is "clearly excessive."[5] Disciplinary Rule 5–103 also permits contingent fees and further explains that a contract for a reasonable contingent fee in a civil case does not violate the rule against acquiring a proprietary interest in a case or in the subject matter of a case. Finally, Alaska Bar Rule 35 provides that, except in domestic relations cases and criminal cases, a "fee may be

---

**4.** In *Stephenson* we denied an attorney admission to the bar under a rule we had promulgated that required law school graduation, despite the existence of a contrary statute permitting admission based on length of practice. *Stephenson,* 511 P.2d at 140–41. We explained our action as follows:

> We have taken jurisdiction pursuant to that provision of the Alaska Constitution vesting the judicial power of the state in this court and under the rule followed by the great majority of states which holds that the supreme court of a state has the inherent and final authority to determine the standards for admission to the practice of law in that state.

*Id.* at 140 (quoting *In re Houston,* 378 P.2d 644, 645 (Alaska 1963)); *see also In re Steelman,* 448 P.2d 817 (Alaska 1969); *In re Brewer,* 430 P.2d 150 (Alaska 1967).

**5.** Disciplinary Rule 2–106 establishes eight factors for determining whether a fee is clearly excessive, including "whether the fee is fixed or contingent." Alaska Code Prof. Resp. DR 2–106. The rule also bans contingent fees in criminal cases. *Id.* Additionally, Ethical Consideration 2–20 provides a thorough set of guidelines for attorneys considering contingent fee agreements. *Id.* at EC 2–20.

contingent on the outcome of the matter for which service is rendered," so long as that fee meets the general requirement that an "attorney's fee will be reasonable." [6]

Citing these provisions of the Alaska Rules of Court, appellee AATL argues that section 3 of the Coalition's initiative proposes to alter, or at least to supplement, court rules previously adopted by this court. We find merit in this argument. Certainly bright line, contingent fee ceilings such as those proposed in the Coalition's initiative would constrain any court's analysis of whether a particular contingent fee was "reasonable," or "clearly excessive," under Bar Rule 35 or Disciplinary Rules 2–106 and 5–103.

Authority from other jurisdictions supports the view that the initiative's proposed contingent fee limit is essentially a court rule. High courts in several states have adopted court rules that impose limits on contingent fees, and in some instances these rules have been strikingly similar to the limits proposed in the Coalition's initiative.[7]

In a seminal 1959 decision, the New York Court of Appeals upheld the courts' power to adopt the original version of the New York contingent fee limits. *Gair v. Peck*, 6 N.Y.2d 97, 188 N.Y.S.2d 491, 160 N.E.2d 43 (1959), *appeal denied and cert. denied*, 361 U.S. 374, 80 S.Ct. 401, 4 L.Ed.2d 380 (1960). Such fee limits, wrote the Court of Appeals, were within the judicial power (and responsibility) "to curb the practice of excessive exactions against clients." *Id.* 188 N.Y.S.2d at 501, 160 N.E.2d at 51. The court expressly rejected the notion that the judiciary should exercise control of the attorney-client contract only in specific cases, and only after disputes as to reasonableness arise.[8]

The decision in *Gair* prepared the foundation for later decisions upholding court-made contingent fee rules, perhaps most importantly *American Trial Lawyers Ass'n v. New Jersey Supreme Court*, 126 N.J.Super. 577, 316 A.2d 19 (App.Div.1974). In *American Trial Lawyers*, a New Jersey intermediate appellate court upheld against constitutional challenge the contingent fee limit adopted by the state supreme court. The intermediate court reasoned that the

**6.** Bar Rule 35 is essentially equivalent to Model Rules of Professional Conduct Rule 1.5. In addition to the reasonableness limit, the Rule also imposes requirements for the actual form a contingent fee agreement must take.

**7.** *See, e.g.*, Mich.Ct.R. 8.121 (adopted in 1985 but based on 1963 rule limiting allowable contingent fees according to multi-tiered, graduated scale of percentages; the current rule imposes flat one-third of recovery limit); N.J. Ct. R. 1:21–7 (limiting allowable contingent fees according to multi-tiered, graduated scale of percentages; original rule effective Jan. 31, 1972); Colo. R. Governing Contingent Fees 1–7 (imposing procedures and limits for contingent fee agreements); *see also* N.Y. Ct. R., Sup.Ct.App. Div. §§ 603.7(e) (1st Dept.); 691.20(e) (2d Dept.); 806.13 (3d Dept.); 1022.31 (4th Dept.) (multi-tiered, graduated scale of percentages, or straight one-third of recovery; original version adopted by App.Div., 1st and 2d Depts. in 1956, pursuant to intermediate courts' statutory authority to regulate attorneys).

Prior to the 1950s, state courts do not appear to have adopted rules limiting attorneys' contingent fees. As late as 1949 the Utah Supreme Court, in a case the Coalition urges us to follow, stated:

[W]e are not aware of any power in the judiciary to fix or regulate attorney's fees. We do

not think it can be inferred from … the power to provide for the examination, licensing or regulation of admission to the bar … nor from the auxiliary power to discipline attorneys…. If there is power in the courts to fix a fee scale or regulate fees, it has not been exercised.

*Thatcher v. Industrial Comm'n*, 115 Utah 568, 207 P.2d 178, 181 (1949). Since the Utah court offered this dubious assessment of court powers, of course, many state courts have exercised their powers to fix fee scales and to regulate contingent fees. Additionally, the Coalition has not directed our attention to, nor have we found, a single recent case to support the *Thatcher* dictum.

**8.** The court in *Gair* wrote:

The duty and function of the Appellate Divisions to keep the house of the law in order does not hinge upon whether clients, worn down by injuries, delay, financial need and counsel holding the purse strings of settlement, knowing little about law or lawyers, have had the stamina to resist in court by hiring other lawyers to be paid out of the other half of the recovery for defending against the first lawyer.

*Gair*, 188 N.Y.S.2d at 501, 160 N.E.2d at 51.

supreme court's constitutional power to regulate the practice of law necessarily included the power to adopt rules governing the conduct of attorneys, both in and out of court. *Id.*, 316 A.2d at 23–24. The court then concluded that the supreme court's power to regulate the practice of law "includes the power to adopt a reasonable rule establishing the outer limits of permissible contingent fees in tort litigation." *Id.* at 24. The New Jersey Supreme Court subsequently adopted the lower court's *American Trial Lawyers Ass'n* opinion *in toto. American Trial Lawyers Ass'n v. New Jersey Supreme Court,* 66 N.J. 258, 330 A.2d 350, 352 (1974). In its opinion, the supreme court described its contingent fee limit as one of many rules it had adopted "of general application regulating the professional conduct of attorneys and their relationships to their clients and to the courts." *Id.* 330 A.2d at 353.

In contrast to the New Jersey and New York experiences, at least one state court with the power to adopt a rule limiting maximum permissible contingent fees has refused to do so. *In re Florida Bar,* 349 So.2d 630 (Fla.1977). In *Florida Bar,* the court considered a petition for amendment of the Code of Responsibility, submitted to the court by the state bar association. *Id.* at 630. The amendment proposed, inter alia, to add to Disciplinary Rule 2–106 a detailed, graduated scale of maximum allowable contingent fees. *Id.* at 630–33 & n. 2. The state supreme court rejected the bar association's specific scale because the

court found no evidence of "remarkable or substantial abuse of the contingent fee system in Florida." *Id.* at 633. The Florida court noted that a finding of urgent need for regulation of contingent fees had been a crucial element of the decisions in *Gair* and *American Trial Lawyers. Id.; see also Gair,* 188 N.Y.S.2d at 51–52, 160 N.E.2d at 52–53; *American Trial Lawyers,* 330 A.2d at 354. Absent such urgency, the Florida court preferred to leave contingent fee regulation to the bar, which was charged with the responsibility of prosecuting those who violate the rules of ethics.[9] *Florida Bar,* 349 So.2d at 635.

The foregoing authorities persuade us that a limit on attorneys' contingent fees is properly classifiable as a rule of court. We note that our decision on this point in no way implies that we either endorse or condemn the idea of imposing specific limits on attorney contingent fees. We also note that we in no way mean to imply that our powers to regulate the practice of law in the state are identical to the comparable powers vested in the supreme courts of any other states. Nevertheless, the resemblance of inherent powers among the state courts is strong enough in this instance to convince us that, pursuant to our inherent powers,[10] we might promulgate or reject a rule limiting contingent fees to maximum permissible amounts, just as other state courts have rejected or promulgated like rules pursuant to like authority.[11]

---

**9.** The Florida court, however, did agree with the bar association that the state suffered from problems related to disclosure and division of contingent fees. *Florida Bar,* 349 So.2d at 636. Accordingly, the court amended the rules of ethics to include new regulation in those areas. *Id.* at 636–37.

**10.** Appellants argue that a limit on contingent fees cannot be a rule of court because such a limit is a matter of "substance" and not "procedure." This argument would carry more force if the rule at issue here were one we might adopt under authority of article IV, section 15 of the Alaska Constitution, which vests in the court the power to adopt rules of administration, practice, and procedure. We have found, however, that a limit on contingent fees invokes our powers under article IV, section 1. Conse-

quently, the distinction between procedural and substantive rules, while still important, is not dispositive, because our judicial power includes the authority to regulate with greater substantive effect inside the limited ambit of the judicial system, than we could under our article IV, section 15 powers. *Thomas v. State,* 566 P.2d 630, 636–38 (Alaska 1977); *cf. State v. Williams,* 681 P.2d 313, 316 (Alaska 1984); *Nolan v. Sea Airmotive, Inc.,* 627 P.2d 1035, 1042–43 (Alaska 1981).

**11.** *Accord Florida Bar,* 349 So.2d at 630; *Carmichael v. Iowa State Highway Comm'n,* 219 N.W.2d 658, 662 (Iowa 1974); *American Trial Lawyers,* 330 A.2d at 353; *American Trial Lawyers,* 316 A.2d at 23–25; *cf. Gair,* 188 N.Y.S.2d at 495, 160 N.E.2d at 47; *Collins v. Godfrey,* 324 Mass. 574, 87 N.E.2d 838 (1949).

## B

■ Article XI of the Alaska Constitution grants broad powers of direct legislation to the people and provides a detailed scheme for the exercise of those powers.[12] Section seven of article XI, however, imposes the following limits on the people's power to enact legislation directly:

> *Restrictions.* The initiative shall not be used to dedicate revenues, make or repeal appropriations, create courts, define the jurisdiction of courts or prescribe their rules, or enact local or special legislation.

Alaska Const. art. XI, § 7. The question before us is whether a limit on contingent fees, which we have found to be a court rule in one sense of the term, is also a court rule within the meaning of this section of the constitution.

Appellant Coalition maintains that the term "[court] rules" in article XI, section 7 refers only to court rules that we might promulgate pursuant to the explicit rule-making authority in article IV, section 15. *See* Alaska Const. art. IV, § 15 (granting supreme court power to make and promulgate rules governing court administration and rules governing practice and procedure in civil and criminal cases in all courts). According to appellant, the restriction against prescribing court rules in article XI, section 7 does *not* apply to rules, such as limits on contingent fees, that we might promulgate pursuant to our inherent power to regulate the practice of law and conduct of attorneys under article IV, section 1. In effect, the Coalition asks us to imply the terms "administration ... practice and procedure" into the restriction of article XI, section 7. We decline to do so.

Certainly, as the Coalition insists, the people's broad constitutional right to legislate by initiative "should be liberally construed to permit exercise of that right." *Thomas v. Bailey,* 595 P.2d 1, 3 & n. 13 (Alaska 1979). The constitution itself urges liberal construction of the initiative right when it states:

> Unless clearly inapplicable, the law-making powers assigned to the legislature may be exercised by the people through the initiative, subject to the limitations of Article XI.

Alaska Const. art. XII, § 11. As forceful a mandate for liberal construction as this section may be, however, it includes an explicit limit. Only the law-making powers *assigned to the legislature* are to be liberally construed as within the people's right to legislate by initiative. As we have noted, the constitution, in article IV, section 1, does not assign the rule-making power at issue here to the legislature, but rather to the courts.

Similarly, it does not necessarily follow that a liberal construction of the people's initiative power requires a narrow construction of the limits that define the power. On the contrary, the mandate for liberal construction of the initiative right in article XII, section 11 concludes with a qualifying, cautionary clause: "subject to the limitations of Article XI." This reiterative warning [13] underscores the importance of the restrictions. Additionally, we must never lose sight of another important right of the people implicated in all cases of constitutional construction, namely the right to have the constitution upheld as the people ratified it. *See Thomas,* 595 P.2d at 3–4. We must interpret all constitutional provisions—grants of power and restrictions on power alike—as broadly as the people intended them to be interpreted.[14]

---

12. Article XI, section 1 establishes the right "to propose and enact laws by the initiative." Alaska Const. art. XI, § 1. Additional sections of article XI establish procedures for exercising the initiative power. *See* Alaska Const. art. XI, §§ 2–4 & 6.

13. The concluding reference in article XII, section 11 to the "limitations of Article XI" simply repeats what is already explicit in the provision that establishes the limitations. Alaska Const. art. XI, § 7. Significantly enough, there is no

similar cross reference in the constitution to connect the term "court rules" in article XI, section 7 with the more limited term "rules governing administration ... practice and procedure" in article IV, section 15.

14. This tension between the power granted versus the restriction imposed is common in cases involving interpretation of constitutional provisions governing direct legislation. *Compare* 1 C. Sands, *Sutherland Statutory Construction* § 4.09, at 135 (Rev. 4th ed. 1985) ("It has been

*Id.; cf. Boucher v. Engstrom,* 528 P.2d 456, 460 (Alaska 1974) ("The people for their own protection have provided that the initiative shall not be employed with respect to certain matters.") (quoting *Bowe v. Secretary of the Commonwealth,* 320 Mass. 230, 69 N.E.2d 115, 128 (1946)), *overruled on other grounds, McAlpine v. University of Alaska,* 762 P.2d 81 (Alaska 1988).

Because of our concern for interpreting the constitution as the people ratified it, we generally are reluctant to construe abstrusely any constitutional term that has a plain ordinary meaning. *Thomas,* 595 P.2d at 3–7; *Division of Elections v. Johnstone,* 669 P.2d 537, 539–40 (Alaska 1983). Rather, absent some signs that the term at issue has acquired a peculiar meaning by statutory definition or judicial construction, we defer to the meaning the people themselves probably placed on the provision. *Thomas,* 595 P.2d at 3–4 & n. 15; *Johnstone,* 669 P.2d at 539. Normally, such deference to the intent of the people requires "[a]dherence to the common understanding of words." *Johnstone,* 669 P.2d at 539.

Here, the task of isolating a readily identifiable, commonly understood meaning for the term "court rules" in article XI, section 7 is complicated by the profusion of ordinary meanings that attach to the word "rule." For example, Webster's Third New International Dictionary (Unabridged) (1966) lists some twenty-five common, current definitions. The first definition listed, and the most general, is:

a prescribed, suggested, or self-imposed guide for conduct or action: a regulation or principle.

*Id.* at 1986. Additionally, Webster's offers several more specific definitions pertinent here:

d (1): a usu. written order or direction made by a court regulating court practice or the action of parties but not making a final judgment on the merits of a

controversy (2): a legal precept applied to a given set of facts as stating the law applicable to a case (3): a statement or doctrine accepted as part of the common law ... e: a regulation or bylaw governing procedure in a public or private body (as a legislature or club) or controlling the conduct of its members ... ([*e.g.,*] a [rule] for admission of new members).

*Id.* The first three definitions in this series focus on the purely legal uses of the term "rule." Indeed the first in the series faintly invokes the term "rules governing administration ... practice and procedure" in article IV, section 15. The final definition in the series, however, reengages the pre-eminent general meaning of "rule"—"a self imposed guide for conduct." Importantly, then, two of the most general, common meanings of the word "rule" coincide almost exactly with our own description above of the article IV, section 1 inherent powers under which we might promulgate a rule limiting attorney contingent fees. Thus, it appears that the commonly understood meaning, or plain meaning, of the term "court rules" logically may encompass rules, like fee limits, that control the conduct of the members of the bar. *Cf. Johnstone,* 669 P.2d at 539; *Thomas,* 595 P.2d at 4–7.

Apparently aware that a plain meaning construction tends to contradict its position, the Coalition relies upon an alternative argument. Both the text of the constitution and the record of the Constitutional Convention, claims the Coalition, reveal an intent to impose a special or peculiar meaning upon the term "court rules" in article XI, section 7. We disagree.

The basic principles of statutory interpretation apply to constitutions. *Thomas,* 595 P.2d at 4. One settled principle of interpretation provides that when words used in a prior statute or constitutional provision are omitted in a subsequent statute or provision, we presume that a change of meaning

---

held that provisions authorizing direct popular participation in law-making should be liberally construed so as not to restrict its use.") *with id.* ("On the other hand, strict compliance is required with conditions and procedures pre-

scribed for making law by [initiative]."). Plainly, the restrictions of article XI, section 7 are important conditions on the initiative right that require strict compliance.

was intended. 2A C. Sands, *Sutherland Statutory Construction* § 51.02, at 454 (Rev. 4th ed. 1984). The words "administration ... practice and procedure," of course, qualify the term "rules" in article IV, section 15, but do not qualify the term "court rules" in the subsequent provision, article XI, section 7.[15] This omission strongly suggests that the framers intended a change in meaning, *i.e.*, that they intended to refer to different sets of rules in the two provisions.

Another settled principle of statutory construction holds that we should interpret the language of a constitutional provision in light of its purpose. *Thomas*, 595 P.2d at 4. As we explained in *Thomas*:

> The restrictions on permissible subjects for direct legislation represent 'a recognition ... that certain particularly sensitive or sophisticated areas of legislation should not be exposed to emotional electoral dialogue and impulsive enactment by the general public.'

*Id.* at 8 (quoting Stewart, *The Law of Initiative Referendum in Massachusetts*, 12 New Eng.L.Rev. 455, 461 (1977)). There is no doubt that the framers of the Alaska Constitution enacted the restrictions on initiative use for the purpose of removing certain "sensitive or sophisticated areas of legislation" from the sphere of the electorate. *See, e.g.*, V. Fischer, *Alaska's Constitutional Convention* 80–81 (1975) (restrictions on direct legislation were meant to protect "critical areas" like the judicial system "against rash, discriminatory, and irresponsible acts").

There is also no doubt that the framers included the term "[court] rules" in article XI, section 7 precisely because they considered such rules far too sophisticated and sensitive to be left vulnerable to the reach of the popular initiative. Delegate Robertson, whose amendment added the restriction against use of the initiative for prescribing court rules to article XI, section 7,

explained his purpose as he spoke in favor of his amendment:

> Mr. President, my proposed amendment is calculated to simply except from the initiative the creation of courts, the defining of their jurisdiction, and the prescribing of the rules, which I believe is self-evident. It is a good thing and shouldn't be left, as I stated on the floor Saturday, to a mass vote because those things are all highly technical.

4 *Proceedings of the Alaska Constitutional Convention* 2978 (Jan. 24, 1956) (remarks of Delegate Robertson). During floor debate over the Robertson amendment, some delegates specifically demanded to hear argument as to why article XI, section 7 should restrict rules of court from the reach of the initiative. *See id.* at 2982–83. Delegate Taylor responded:

> The rules are a very important part of our ... system of jurisprudence and I don't believe that anybody should have the right to change them unless it is the bar, the judicial commission, or the courts [, who] had a chance to explain to the persons who are going to change them what the importance is[.] [S]o I don't believe you could do it under the initiative and referendum process. I think all parts of the amendment as proposed by Mr. Robertson should be retained as it is for the protection of the people and the protection of the courts.

*Id.* at 2983 (remarks of Delegate Taylor).

In our view, rules regulating the practice of law often are equally as sophisticated, technical, or sensitive as rules governing the administration, practice, and procedure in the courts. Thus, the purpose of the restriction against prescribing court rules in article XI, section 7 logically extends to rules we may adopt under our article IV, section 1 power to regulate the practice of law and the conduct of attorneys in the state.

In sum, the plain meaning of the relevant constitutional provisions, the proper inter-

---

**15.** Article XI, section 7 is "subsequent" to article IV, section 15 in the text of the constitution itself, and in time of adoption at the constitutional convention. *See, e.g.*, 4 *Proceedings of the Constitutional Convention* 2983 (Jan. 24, 1956)

(remarks of Delegate Johnson) (referring, during debate over article XI, to the adoption of the Judiciary Article—article IV—on the previous day, Jan. 23, 1956).

pretation of those provisions in context, and the pertinent legislative history, taken together, convince us that an attempt to limit contingent fees is an attempt to prescribe a rule of court, within the meaning of article XI, section 7. We conclude that the lieutenant governor correctly denied certification of the Coalition's original initiative.

## III

■ The Coalition also has appealed the superior court's decision to award partial attorney's fees of $1,440 to the state and of $9,348 to AATL. The trial court determined that the Coalition is not a public interest litigant in this matter and, therefore, assessed attorney's fees against the Coalition, pursuant to Civil Rule 82. The Coalition asserts that it is a public interest litigant and that it should be exempt from paying attorney's fees. We review the trial court's determination of the Coalition's status under the abuse of discretion standard. *Johnson v. Tait*, 774 P.2d 185, 190 (Alaska 1989).

We have named four criteria for identifying a public interest litigant:

(1) Is the case designed to effectuate strong public policies?

(2) If the plaintiff succeeds will numerous people receive benefits from the lawsuit?

(3) Can only a private party have been expected to bring the suit?

(4) Would the purported public interest litigant have sufficient economic incentive to file suit even if the action involved only narrow issues lacking general importance?

*Anchorage Daily News v. Anchorage School District*, 803 P.2d 402, 404 (Alaska 1990). We also have held that a litigant must satisfy all four criteria to be deemed a public interest litigant. *Id.; Murphy v. City of Wrangell*, 763 P.2d 229, 233 (Alaska 1988). Here, as in *Anchorage Daily News* and *Murphy*, the only question in dispute is whether the trial court erred in finding that appellant did not satisfy the fourth criterion. *See Anchorage Daily News*, 803 P.2d at 404; *Murphy*, 763 P.2d at 233.

The Coalition's position on its own financial interest is contradictory. On the one hand it suggests that it might have gained some *indirect* economic benefit from a successful outcome of the litigation. On the other hand, it asserts that "there is simply no financial gain for the Coalition in this lawsuit." In any event, the Coalition argues that merely minimal economic interest cannot destroy a litigant's capacity to satisfy the fourth criterion. Indeed, we previously have held so. *See, e.g., Alaska Survival v. State, Dep't of Natural Resources*, 723 P.2d 1281, 1292 (Alaska 1986) (litigants' interest in natural source of firewood and building logs not substantial enough to preclude public interest status).

Yet, oddly enough, the Coalition fails to explain why it will gain no direct profit from the litigation. The Coalition also fails to explain why, or how, or in what minimal amount it might gain indirect profit. In fact, our review of the record shows that the Coalition simply has failed to explain who or what it is. Instead, it has maintained near anonymity throughout the course of its lawsuit. All we really know about the Coalition is that it is a "nonprofit corporation." In this regard, the state of the record contrasts sharply with other cases in which we have determined a party's economic motives. In those cases, we were able to review specific facts about the character of the professed public interest litigant and the nature of that litigant's real financial stake in the lawsuit. *E.g., Oceanview Homeowners Ass'n v. Quadrant Construction & Engineering*, 680 P.2d 793, 799 (Alaska 1984) (litigant consistently had shown health and safety concerns to be at the heart of its motive to litigate); *Kenai Lumber Co. v. LeResche*, 646 P.2d 215, 223 (Alaska 1982) (court was able to determine likely economic motive from commercial setting of the litigation).

In the present case, the Coalition offers only its own pursuit of its lawsuit as proof that its true motive was to benefit the electorate of the state by providing an opportunity to vote on an important initiative.

The Coalition thus tends to show that its lawsuit was, in some sense, in the public interest. The Coalition, however, fails to show anything at all about the lawsuit's relationship to the Coalition's own interests. The superior court committed no abuse of discretion in finding that the Coalition was not a public interest litigant.

### IV

We hold that section 3 of the Coalition's proposed initiative was an attempt to prescribe a rule of court. We hold that article XI, section 7 of the Alaska Constitution precludes use of the initiative to prescribe such a rule of court. And we find no abuse of discretion in the superior court's award of partial attorney's fees to appellees. Accordingly, the decision of the superior court is AFFIRMED.